CHILLICOTHE SAND & GRAVEL COM-
PANY, a Delaware Corporation,
Plaintiff-Appellant,

v.

MARTIN MARIETTA CORPORATION,
a Maryland Corporation,
Defendant-Appellee.

No. 79–1729.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1979.

Decided Jan. 23, 1980.

As Amended Feb. 5, 1980.

Rehearing Denied Feb. 21, 1980.

Hamilton Smith, Chicago, Ill., for plaintiff-appellant.

Keith F. Bode, Jenner & Block, Chicago, Ill., for defendant-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and WOOD, Circuit Judges.

CASTLE, Senior Circuit Judge.

The issue presented for review is whether plaintiff-appellant Chillicothe Sand & Gravel Corp., (CS&G) established a prima-facie violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The district court granted defendant-appellee Martin Marietta's motion for a directed verdict at the close of CS&G's evidence and CS&G appeals. We affirm.

I.

Martin Marietta is a large, diversified company with holdings in various fields including the production of sand and gravel (aggregates). It has aggregates holdings in fifteen states, including five facilities in Illinois (Chillicothe, Spring Bay, Pekin

North, Pekin South and Lincoln). It entered the aggregates field in Central Illinois in 1964. Due to transportation costs the aggregates business is essentially a local one and producers are able to compete effectively only in a limited area around their sources.

The practices of Martin Marietta's Chillicothe location are the subject of this suit. Chillicothe is the only Martin Marietta facility with which CS&G considers itself to be competing and is in close proximity to CS&G's sole facility. Therefore, the geographic market involved in this case is limited to the area serviced by these two locations. The scope of this suit is further narrowed by the consensus among the parties that this case only involved competition in the sale of CA–6 road gravel.[1]

CS&G began competing with Martin Marietta's Chillicothe facility in the production of CA–6 in Spring, 1973. CS&G's founders, William and James Taylor, operated a sewer and water main construction business and decided that road gravel sales would be a natural adjunct to their construction business. Moreover, they were encouraged to enter the road gravel business by the developer of a project for which the Taylors were constructing the water mains. The developer, American Central Corporation, was not satisfied with the gravel it was receiving from its supplier, sought another source of gravel, and agreed to purchase CA–6 from the Taylors. An additional factor was the ease of entry into the field. The Taylors began CS&G with an investment of $65,000, of which $40,000 was borrowed. This amount covered both the purchase of the equipment necessary to operate a CA–6 plant and the rental of the

land needed; the land was rented for a $750 minimum annual royalty. Although the equipment had to be replaced in September, 1976 for $235,000, CS&G's ability to enter the market and compete vigorously with Martin Marietta for $65,000 is significant.

CS&G's entry into the CA–6 market marked the beginning of a fierce competitive war between CS&G and Martin Marietta. The fierceness of the competition was due, in part, to the nature of the CA–6 market. The major purchasers of CA–6 are awarded jobs on the basis of competitive bidding. Accordingly, price is a major concern of CA–6 purchasers and they actively promote competition among sellers by informing one seller of a competitor's price and demanding a lower price. Sellers must attempt to ascertain their competitors' prices (purchasers aren't always truthful in their efforts to play sellers off against each other) and the price at which they can obtain business and yet make a profit.

The conflict between CS&G and Martin Marietta contains numerous instances of price cuts, customers gained, additional price cuts, and customers lost. CS&G views the facts as demonstrating that it fairly priced its product and won customers from Martin Marietta and that Martin Marietta responded by unfairly price-cutting and illegally taking customers away from CS&G. Martin Marietta views the facts as demonstrating that CS&G undercut Martin Marietta's price, that Martin Marietta stood by passively and watched its market share and CA–6 sales slip, that Martin Marietta then fought back with vigorous competition, that in late 1977 CS&G made two business decisions which adversely affected its sales of CA–6,[2] and that when the dust had settled

---

1. Aggregate products are classified according to the size of the aggregate particles. An initial distinction is made between coarse aggregates (CA) and fine aggregates (FA). Further size gradations are also applied and an additional distinction is made between washed and unwashed aggregates. Martin Marietta's Chillicothe facility produces a variety of aggregate products, including FA–1 (a washed sand used primarily by ready-mix concrete producers); CA–5; CA–7; CA–14; CA–16 (all of which are washed coarse aggregates also used by ready-

mix concrete producers); and CA–6. CA–6 is a coarse, unwashed gravel which is used primarily in the construction of roads, parking lots and driveways. CS&G is, for all practical purposes, solely engaged in the production of CA–6.

2. The two decisions which Martin Marietta points to were a price increase by CS&G (from an average price of $1.53 per ton to a price of $2.50 per ton) and entry by CS&G into the blacktopping business. The former decision

CS&G was the loser in a fair battle for the CA–6 market.[3]

▪ This Court need not adopt either of these views. Instead, it is our task to determine whether there is substantial evidence to support CS&G's claim and upon which evidence a jury could properly have found in favor of CS&G. *See, e. g., Gunning v. Cooley,* 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720 (1930), *Hohmann v. Packard Instrument Co., Inc.,* 471 F.2d 815 (7th Cir. 1973). This standard, which requires this Court to view all of the evidence in the light most favorable to CS&G, applies to treble damage suits under the antitrust laws as well as to other types of suits. *Continental Co. v. Union Carbide,* 370 U.S. 690 n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). *See also Cal. Computer Products v. IBM Corp.,* 1979–1 Trade Cases ¶ 62,713 (9th Cir.).

## II.

CS&G claims that Martin Marietta monopolized or attempted to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[4] To prove monopolization one must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384

U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The elements of attempt to monopolize are: "(1) specific intent to control prices or destroy competition with respect to a part of commerce, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success." *Gough v. Rossmoor Corp.,* 585 F.2d 381, 390 (9th Cir. 1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). *See also American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). CS&G uses the same evidence in its efforts to establish both its claims of monopolization and of attempt to monopolize. However the evidence is inadequate to raise a jury question as to either claim.

CS&G's evidence falls short of the mark in that it fails to present a prima facie case that Martin Marietta engaged in "predatory conduct." CS&G claimed that Martin Marietta had engaged in such conduct and, by so engaging, had violated the second element of monopolization, the acquisition of monopoly power by means other than superior product or business acumen. Proof of predatory conduct is also necessary to CS&G's claim of attempt to monopolize; CS&G relied on its allegations of predatory conduct to support claims that Martin Marietta violated both the first and second elements of attempt to monopolize.

---

gave Martin Marietta a clear competitive advantage; the latter placed CS&G in direct competition with the best customers for CA–6 and resulted in the loss of almost all of CS&G's blacktopper sales. CS&G claims that both of these decisions were made out of desperation

and that it was driven to make the decisions because of Martin Marietta's illegal competitive acts.

**3.** In analyzing the competition between Martin Marietta and CS&G, certain figures are useful. They are as follows:

|  | SALES IN TONS | | SALES IN DOLLARS | | AVG. PRICE | |
|---|---|---|---|---|---|---|
|  | MM | CS&G | MM | CS&G | MM | CS&G |
| 1973 | 196,600 | 48,365.44 | $311,700 | $ 72,342.99 | $1.59 | $1.50 |
| 1974 | 132,400 | 83,980.17 | 248,300 | 138,266.51 | 1.88 | 1.65 |
| 1975 | 132,100 | 110,449.38 | 241,700 | 206,391.67 | 1.83 | 1.87 |
| 1976 | 201,900 | 188,259.73 | 337,200 | 323,522.09 | 1.67 | 1.72 |
| 1977 | 196,400 | 132,329.38 | 316,200 | 202,455.64 | 1.61 | 1.53 |
| 1978 | 331,700 | 56,143.88 | 593,700 | 110,405.88 | 1.79 | 1.97 |

---

**4.** 15 U.S.C. § 2 states, in pertinent part, that: "Every person who shall monopolize or attempt to monopolize . . . any part of the trade or commerce among the several

States . . . shall be deemed guilty of a felony . . . ."

The cornerstone of CS&G's efforts to demonstrate the presence of predatory conduct is Martin Marietta's pricing policy. CS&G views Martin Marietta's pricing policy as predatory in nature and as an attempt to illegally drive CS&G out of business. However, CS&G views Martin Marietta's pricing policy in light of its effect on a competitor rather than its effect on competition. The antitrust laws do not accept this view. *Anheuser-Busch, Inc. v. F.T.C.*, 289 F.2d 835, 840 (7th Cir. 1961). Rather, it is necessary to view Martin Marietta's price policy in light of its effects on the proper functioning of a competitive market for CA–6.

The question of when a competitor's pricing policy should be considered predatory is the subject of ongoing debate. Professors Areeda and Turner maintain that prices at or above marginal cost should be conclusively presumed non-predatory. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 733 (1975). Marginal costs are defined as "the increment to total cost that results from producing an additional increment of output." *Id.* at 700.[5] Areeda and Turner also feel that average variable costs should serve as a surrogate for marginal costs and, accordingly, that "[a] price at or above reasonably anticipated average variable costs [even if below average costs] should be conclusively presumed lawful." *Id.* at 733. They go on to conclude that "[a] price below reasonably anticipated average variable cost should be conclusively presumed unlawful." *Id.*

Areeda and Turner cite four major reasons in support of their proposition, stating that:

First, predatory pricing rules must take into account the proclivity of competitors to challenge a rival's price cuts, particularly when the rival is a larger firm. The threat of litigation may therefore deter legitimate competitive pricing. Second, pricing at *SRMC* [short run marginal cost] is the result in competitive markets, and has the social welfare virtue of avoiding wasteful idling of current productive resources. Third, rules requiring price floors higher than *SRMC* will tend to preserve inefficient rivals or attract inefficient entry. Fourth, elimination or exclusion of rivals may in some instances cause long-run welfare losses that exceed the short-run gains from fuller use of capacity, but such long-run consequences cannot feasibly be incorporated into legal rules because they are intrinsically speculative and indeterminate.

Areeda & Turner, *Williamson on Predatory Pricing*, 87 Yale L.J. 1337, 1339 (1978). These reasons have convinced many; several circuits have adopted Areeda & Turner's position and have stated that proof of below marginal cost-pricing is a requisite element of a prima facie case of predatory pricing. *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 724 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). *See also Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).[6]

5. Other relevant measures of cost are fixed, variable, and average costs. Fixed costs are those costs which, in the short run, do not vary with changes in output. Fixed costs generally include items such as management expenses, interest on bonded debt, and other items of irreducible overhead. Variable costs are those costs which in the short run vary with changes in output, including items such as raw materials, labor directly used in production, and per unit royalties. Average cost is the sum of fixed cost and total variable cost, divided by output. The definitions of fixed and variable costs are limited to the short run because all costs are considered variable in the long run. 88 Harv.L. Rev. at 700.

6. We take note of the fact that both the Fifth and the Ninth Circuits have indicated a willingness to stray from a solely marginal or average variable cost standard under proper circumstances. *International Air Industries*, 517 F.2d at 724; *Hanson*, 541 F.2d at 1358 n. 5; *Janich*, 570 F.2d at 858; *See also Transamerica Computer Co. v. IBM Corp.*, 1979–2 Trade Cases ¶ 62,989 (N.D.Cal.), at p. 79,636.

■ However, Areeda and Turner's position has not been universally accepted. Professor Scherer's critique concluded that "it is unrealistic and even analytically wrong to apply a simple short-run price-cost rule for determining whether exclusionary pricing by a monopolist is socially undesirable and therefore predatory." Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv.L.Rev. 869, 890 (1976). *See also* Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284 (1977). Additionally, the Tenth Circuit has declined the opportunity to use a solely marginal cost-based test for predatory pricing. *Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.*, 551 F.2d 790 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 *rehearing denied*, 434 U.S. 977, 98 S.Ct. 543, 54 L.Ed.2d 472 (1977). Moreover, Areeda and Turner admit a willingness to allow damage to competition and the destruction, by one competitor, of equally efficient competitors as long as prices remain at or above marginal costs. Their reasons for this willingness include an inability to arrive at a "satisfactory" method of eliminating this risk and administrative ease. 88 Harv.L. Rev. at 711. However, Section 2 of the Sherman Act makes no exceptions for cases involving administrative difficulty. Accordingly, while we accept the use of marginal or average variable cost as both a relevant and an extremely useful factor in determining the presence of predatory conduct, we are willing to consider the presence of other factors in our evaluation of whether or not CS&G has made out a prima facie case of monopolizing or attempt to monopolize. *See Pacific Engineering*, 551 F.2d at 797.

### III.

■ Evaluation of Martin Marietta's conduct leads this Court to agree with the district court's conclusion that CS&G did not present sufficient evidence of predatory conduct. Initially, we note that Martin Marietta's general price level, standing by itself, is not predatory. It is uncontested that Martin Marietta priced CA–6 above its average variable cost; it is indicated that Martin Marietta was prepared to present evidence that its average variable cost per ton in the production of CA–6 was $.65 in 1976 and $.71 in 1977. Furthermore, the relationship between Martin Marietta's prices and average total cost was as follows:

|  | Avg. Price | Avg. Total Cost[7] |
|---|---|---|
| 1975 | 1.83 | 1.412 |
| 1976 | 1.67 | 1.638 |
| 1977 | 1.61 | 1.547 |

Thus Martin Marietta's prices were very close to and, generally, above average total cost.

In selling at a level which was above its average variable cost Martin Marietta acted in an economically rational manner, derived immediate economic benefit from its sales, and did not engage in the "deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition." Areeda & Turner, 88 Harv.L.Rev. at 698. *See also Int'l Air Industries,* 517 F.2d at 725. Although CS&G claims that its evidence of the relationship between Martin Marietta's costs and prices "simply served to confirm" the predatory nature of Martin Marietta's conduct, this Court finds no such confirmation in the evidence presented. Nevertheless, we turn to the other aspects of Martin Marietta's conduct through which CS&G attempts to prove predatory conduct.

■ In addition to complaining of the general level of Martin Marietta's prices for CA–6, CS&G claims that Martin Marietta engaged in unfair bidding in order to obtain specific customers; CS&G attaches great antitrust significance to Martin Marietta's bidding practices. We attach no such sig-

---

**7.** The costs used here are taken from plaintiff's exhibit 134 and represent the average total costs alleged by CS&G. The district court excluded this exhibit at trial, ruling that CS&G had not laid a proper foundation for admission. Nevertheless, even if these figures are used, they demonstrate that CS&G's evidence of predatory pricing is inadequate.

nificance. CS&G established itself as a seller of CA–6 by attempting to ascertain Martin Marietta's price level, determining the price at which CS&G could acquire business and yet maximize its profit, and by pricing at that level. It should come as no surprise to CS&G that Martin Marietta would respond by pricing in a similar manner. Indeed, a failure by Martin Marietta to so price soon would have left it with no CA–6 sales. Martin Marietta's bidding practices were the essence of competition and contributed to the highly competitive market for CA–6 sales. Although Martin Marietta's actions may have injured CS&G as a competitor we cannot, as a matter of law, interpret Martin Marietta's bidding practices as being predatory.

■ CS&G goes on to claim that Martin Marietta engaged in package pricing and that such pricing was predatory. Package pricing was defined as the practice, by Martin Marietta, of giving construction companies price quotations for the various aggregate products required on a particular project with the understanding that the price quoted for each of the aggregates was dependent on the purchase of all the aggregates in the package. However, of the three sand and gravel purchasers that CS&G called to testify about Martin Marietta's package pricing, only one purchased CA–6. That one witness, Albert Cole, testified that his employer (McDougall-Hartman Co.) obtained construction contracts through competitive bidding, that prior to bidding McDougall-Hartman would obtain price quotes for the various items to be used in a project, and that it was in McDougall-Hartman's interest to obtain all of its sand and gravel needs for a particular contract from a single source. Cole further testified that drivers tended to get lost, that using a single source made it easier to locate drivers, and that McDougall-Hartman asked suppliers for price quotes for all of its aggregate needs for each particular contract. Moreover, there is no evidence that Martin Marietta refused to sell individual components of a package; rather, the price of components would change if the package was broken up. In light of this evidence we

conclude that the jury could not have properly found Martin Marietta's package pricing to be predatory. *See United States v. Kohler,* 1953 Trade Cases ¶ 67,553 (E.D. Pa.).

■ CS&G also claims that Martin Marietta's reduction, in April of 1976, of its "plant price" was predatory. This price, which was the level at which CA–6 was available for small or isolated purchases, was lowered from $2.76 per ton to $1.70 per ton. This reduction by Martin Marietta was no more predatory than Martin Marietta's other prices. Only a small portion of Martin Marietta's sales were made at "plant price" and, during a period when Martin Marietta's average price was $1.67 per ton, the formal reduction of prices which already had been reduced *de facto* is unimportant. Additionally, CS&G's president admitted that its prices were "pretty close to that [$1.70] level anyhow." The district court properly refused to attach antitrust significance to this price reduction.

■ There are several other actions taken by Martin Marietta which CS&G claims were predatory. These actions include one incident of product disparagement and a warning to CS&G that Martin Marietta "wouldn't appreciate" CS&G's entry into the market and that CS&G's founders would discover that operating a sand and gravel pit was a difficult task. However, the evidence clearly demonstrates that neither of these incidents had any effect on CS&G. These actions, in and of themselves, were not predatory; nor are they sufficient to convince us that Martin Marietta's pricing policy was predatory. As noted by the Tenth Circuit under similar circumstances:

> Predatory pricing is the essential unfair means alleged in this case. The other practices employed by [the defendant] inflicted no independent harm. They were merely auxiliaries to its general pricing policy . . . . If the trial court correctly found [the defendant's] pricing was not predatory in itself, we do not believe [the defendant] can be found guilty of violating the Sherman Act.

*Pacific Engineering*, 551 F.2d at 795. *See also Hayes v. Solomon*, 597 F.2d 958, 977 (5th Cir. 1979). Accordingly, we conclude that the district court properly granted Martin Marietta's motion for a directed verdict.

Two other issues were raised by CS&G: the exclusion of some evidence and CS&G's measure of damages. In light of our ruling on the issue of predatory conduct, we need not reach these issues. The decision of the District Court is, therefore,

AFFIRMED.