**TRANSAMERICA COMPUTER COMPANY, INC., a corporation, Appellant,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, a corporation, Appellee.**

**No. 80–4048.**

United States Court of Appeals, Ninth Circuit.

Argued Oct. 14, 1981.

Submitted Feb. 10, 1982.

Decided Feb. 15, 1983.

1378

**1380**

Richard J. Lucas, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for appellant.

William W. Vaughn, O'Melveny & Myers, Los Angeles, Cal., for appellee.

Before PREGERSON and CANBY, Circuit Judges, and LUCAS,* District Judge.

PREGERSON, Circuit Judge:

Appellant Transamerica Computer Company (Transamerica), a wholly owned subsidiary of Transamerica Corporation, alleges that Appellee International Business Machines (IBM) violated Section 2 of the Sherman Act, 15 U.S.C. § 2, when it took various actions to combat emerging competition in the "plug-compatible" peripherals market. The district court held that IBM's actions did not violate the antitrust laws.

On appeal, Transamerica challenges the district court's ruling that IBM's acts did not "unreasonably restrict" competition and, in particular, challenges the court's test for predatory pricing. We affirm the district court's decision but modify its test for predatory pricing.

BACKGROUND

At the heart of a computer system is the central processing unit (CPU), which houses arithmetical and logical electronic circuits.

Attached to the CPU are devices called "peripherals," which perform input, output, storage, and control functions. IBM, long the dominant force in the computer industry, was, and remains, the major supplier of both CPUs and peripherals.

In 1967, a number of companies began offering plug-compatible peripherals—devices which could be attached to IBM's CPUs. These plug-compatible manufacturers (PCMs) enjoyed immediate market success because they offered, at substantial discounts, plug-compatible peripherals that performed as well as or better than IBM's peripherals.

Transamerica was formed to supply needed capital to PCMs. In financing transactions central to this case, Transamerica purchased millions of dollars of peripherals from two PCMs, Marshall Industries and Telex Corporation, which had previously leased these items to end users. Under this arrangement, these PCMs raised substantial capital, and Transamerica, in addition to acquiring the equipment and underlying leases, received substantial tax advantages.

IBM responded to vigorous competition from the PCMs by engaging in a number of programs which Transamerica characterizes as violations of the Sherman Act. These challenged programs included:

(1) *Leasing Program*—Prior to May 1971, IBM customers could either buy peripheral equipment or lease it on a month-to-month basis. In May 1971, IBM announced an additional method of leasing peripheral equipment—a Fixed-Term Lease Plan under which customers could lease peripheral equipment for one year at an eight percent discount below the month-to-month rate, or for two years at a sixteen percent discount.

(2) *Design Changes*—In the early 1970s, IBM redesigned the interface between the CPU and the peripherals of three tape drive systems so that PCM's peripherals would no longer be

---

* The Honorable Malcolm Lucas, United States District Judge for the Central District of California, sitting by designation.

compatible with IBM's CPUs. IBM also removed an optional selector channel from two CPU models, the System 370 Models 115 and 125, so that PCM's peripherals could no longer be used with those models.

(3) *Pricing Behavior*—Also in the early 1970s, IBM introduced several "new" products—basically repackaged versions of prior peripherals—at lower prices.

Whether one characterizes IBM's actions as "meeting" competition or "precluding" competition, there is no doubt that IBM's strategy worked. Transamerica, along with fifteen out of seventeen companies involved with plug-compatible peripherals, left the market after suffering huge losses.

Because of IBM's actions in the peripherals market, Transamerica sued IBM for violations of the antitrust laws. Several other companies involved with plug-compatible peripherals also brought suits against IBM. Although initially consolidated, the actions were tried separately. Two of those actions, involving issues and facts similar to those presented here, have already been before this court. In both instances we upheld directed verdicts for IBM. *California Computer Products, Inc. v. IBM*, 613 F.2d 727 (9th Cir.1979) (*CalComp*); *Memorex Corp. v. IBM*, 636 F.2d 1188 (9th Cir. 1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981) (*Memorex*).

The instant case went to trial before a jury in December 1978. The trial consumed 120 days. After deliberating for ten days, the jury deadlocked and was discharged. Under a pretrial stipulation, the district judge then became the trier of fact. He ruled for IBM on all major issues. He held that (1) IBM was not a monopolist in either

the general computer systems market or the peripherals market; (2) assuming, arguendo, that IBM possessed monopoly power, its leasing program, its design changes—with the exception of the design of the System 370 Models 115 and 125—and its pricing behavior did not unreasonably restrain competition; (3) IBM had not attempted to monopolize the general computer systems market or the peripherals market; and (4) assuming that Transamerica established antitrust liability, it had not proved that it suffered antitrust damages. The district court also found that IBM's redesign of the System 370 Models 115 and 125 would have unreasonably restricted competition had IBM been a monopolist, but since IBM was not a monopolist and since Transamerica suffered no damages resulting from that design change, IBM's redesign of the two CPUs did not render IBM liable for antitrust damages. *In re IBM Peripheral EDP Devices Antitrust Litigation, Transamerica Computer Co. Inc. v. IBM*, 481 F.Supp. 965 (N.D.Cal.1979) (*Transamerica Computer*).

STANDARD OF REVIEW

Transamerica challenges several of the district court's findings of fact.[1] The district court's findings may not be reversed unless clearly erroneous. Fed.R.Civ.P. 52(a). Under this standard

[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

---

1. Transamerica also challenges a number of jury instructions, arguing that

 [b]ecause this was a jury trial and because there was no waiver of the jury, this Court has the same duty to review the instructions and if erroneous and prejudicial, to reverse the judgment below as it would in any other jury trial.

 Transamerica Brief at 27.

Transamerica, however, freely and unconditionally stipulated before trial that the district court would decide the case if the jury was unable to reach a verdict. The stipulation was intended to avoid the expense of a retrial. 10/20/78 Tr. 8–10; 11/17/78 Tr. 18–20. By so stipulating, Transamerica agreed to a court trial if the jury deadlocked, and thus instructions given to the deadlocked jury are irrelevant to this appeal.

## MONOPOLIZATION AND ATTEMPT TO MONOPOLIZE

■ Transamerica charges that IBM either monopolized or attempted to monopolize certain segments of the computer market. These separate offenses are governed by different tests. To establish monopolization, a plaintiff must prove:

(1) possession of monopoly power in the relevant market;

(2) willful acquisition or maintenance of that power; and

(3) causal "antitrust" injury.

*CalComp,* 613 F.2d at 735.

■ To establish that a defendant attempted to monopolize, a plaintiff must prove:

(1) specific intent to control prices or destroy competition with respect to a part of commerce;

(2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose;

(3) a dangerous probability of success; and

(4) causal "antitrust" injury.

*Id.* at 736.

■ There is an important relationship between the second elements of these two offenses. Conduct that does not constitute "willful acquisition or maintenance" of monopoly power (thus precluding establishment of the offense of monopolization) *cannot* constitute the "predatory or anticompetitive conduct" required to establish the offense of attempt to monopolize. *See CalComp,* 613 F.2d at 738, *quoting* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 828, at 321 (1978) ("conduct lawful for a monopolist must, *a fortiori,* be excluded as a basis for the attempt offense."). We will analyze IBM's conduct with this principle in mind. We will assume that IBM possessed monopoly power. If IBM's conduct proves lawful despite that assumption, then, *a fortiori,*

IBM's conduct could not constitute an attempt to monopolize, thereby eliminating the need to consider this offense.

## LEASING PRACTICES

■ Transamerica alleges that IBM's Fixed Term Lease Plan (FTP) unreasonably restrained competition. Plaintiffs in both *CalComp* and *Memorex* challenged the legality of the FTP. Both times, this court upheld directed verdicts in favor of IBM on that issue. *CalComp,* 613 F.2d at 741–42; *Memorex,* 636 F.2d at 1188. The district court here also concluded that the FTP was legal. *Transamerica Computer,* 481 F.Supp. at 1001–02.

Transamerica asserts that this court's previous decisions on the FTP are not controlling because they were based on findings of fact proved erroneous in the instant trial. The district court's findings of fact, however, are indistinguishable from the findings in *CalComp* and *Memorex.* Transamerica has not demonstrated that the district court's findings in the instant case are clearly erroneous. Therefore, the holdings of *CalComp* and *Memorex* control our disposition of this issue, and the district court's holding must be affirmed. *See also Greyhound Computer Corp. v. IBM,* 559 F.2d 488, 498–99 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).

## DESIGN CHANGES

■ IBM's design changes challenged in this case—redesign of the interface between the CPU and certain peripherals—are of the same type as those previously contested in *CalComp* and *Memorex.* Those cases upheld the legality of IBM's design changes. The district court here made a similar ruling, finding that the contested changes were improvements in the products, were not unreasonably restrictive of competition, and hence did not violate the Sherman Act.[2] *Transamerica Computer,*

---

**2.** This court has stated that in determining whether a defendant's conduct constitutes the willful acquisition or maintenance of monopoly power required for the offense of monopolization, "the test is whether the defendant's acts,

otherwise lawful, were *unreasonably* restrictive of competition." *CalComp,* 613 F.2d at 735–36 (footnote omitted) (emphasis in original). Likewise, we have said that to determine whether defendant's conduct constitutes the

481 F.Supp. at 1003–05. Transamerica has not demonstrated how the design changes in this case can be distinguished from the changes in the two other cases or how the district court's findings are clearly erroneous. Again, on the authority of *CalComp* and *Memorex,* we affirm the district court's ruling that the interface changes were not unreasonable. *See also Telex Corp. v. IBM,* 510 F.2d 894, 902, 906 (10th Cir.1975), *rev'g* 367 F.Supp. 258 (N.D.Okla.1973), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

Transamerica also charges that IBM's redesign of the System 370 Model 115 and 125 CPUs unreasonably restricted competition. The 115 and 125 models were the smallest of IBM's System 370 CPUs. The models included a channel for attaching slower speed devices. The district court found that IBM redesigned the models to operate just short of the speed that would have enabled peripherals manufactured by PCMs to attach, and thus that the change unreasonably restricted competition. *Transamerica Computer,* 481 F.Supp. at 1006–08.

The district court, however, refused to award Transamerica damages for two reasons. First, it found that IBM did not possess monopoly power in the requisite market. Second, it found that Transamerica did not suffer any injury as a result of IBM's conduct because

> [t]he market for the tapes excluded by this conduct was insignificant. Only tape drives with data rates between 30 and 50KB were affected. Those were older, low performance technology devices that would only have been competitive at prices far below those contemplated in Transamerica's 'damage claim. Transamerica probably owned some of them, but its President didn't know how many, and any Transamerica owned were purchased in the second Telex tape contract. Because that contract was not an arms-length transaction, this Court would be

reluctant to award Transamerica any damages on the equipment purchased thereunder. Also, there is no evidence that Transamerica in the past supplied peripherals for the 115/125 migrator systems, or that it intended to, or took any steps to supply peripherals for the 115 and 125 systems.

*Transamerica Computer,* 481 F.Supp. at 1008 n. 109.

 We need not consider the first of these findings—that IBM lacked monopoly power—because we hold that the district court's finding that Transamerica suffered no damages attributable to the redesign of the Models 115 and 125 is not clearly erroneous. Without proving antitrust injury, Transamerica cannot recover for the antitrust violation if, in fact, any violation occurred. *CalComp,* 613 F.2d at 732. We affirm the district court's holdings on IBM's design changes.

## PREDATORY PRICING

### A. *The District Court's Findings*

In response to the challenge from the PCMs, IBM introduced several "new" products which actually were repackaged versions of existing products. The "new" products were priced below the older versions. Transamerica asserts that these lower prices were predatory.

The district court carefully examined these price cuts. *Transamerica Computer,* 481 F.Supp. at 996–1002. It concluded that IBM expected the new products to "return substantial profits," *id.* at 997; that, in fact, the products were profitable; and that the prices at issue exceeded the average total cost of producing the products. *Id.* at 1002. After an extensive analysis, the court concluded that IBM's pricing policy was legal.

 The district court's finding that the challenged prices exceeded IBM's average cost is not clearly erroneous.[3] The district

---

kind of predatory or anticompetitive action required for the offense of attempt to monopolize, "individual conduct is measured against the same 'reasonableness' standard." *Id.* at 737.

**3.** At trial, IBM presented evidence that the prices challenged by Transamerica were above average total cost. Transamerica contended that IBM's prices, after application of several accounting adjustments, were below average

court, however, applied an incorrect test in deciding whether such prices are predatory. We set out the correct test below, apply that test to this case, and conclude that IBM's pricing policy was legal.

### B. The Economic and Legal Background

We differ with the district court on the proper analysis of situations where a defendant's prices are alleged to be predatory even though they exceed the defendant's average total cost. To analyze such situations, a preliminary discussion of economic terminology and legal precedents is helpful.

Predatory pricing occurs when a company that controls a substantial market share lowers its prices to drive out competition so that it can charge monopoly prices, and reap monopoly profits, at a later time. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1031–32 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); L. Sullivan, *Handbook of the Law of Antitrust* 109 (1977). It can be difficult, however, to distinguish predatory price cuts intended to eliminate competition from legitimate price cuts designed to meet or beat competition. An influential attempt to clarify the distinction was made by Professors Phillip Areeda and Donald Turner, who proposed a "cost-based" test for predation.[4] Under such a test, the relation between the cost of producing a product and the price charged for it is the criterion for determining whether the price is predatory.

Economists, however, measure a firm's costs in a number of ways, and these measures are relevant in understanding the Areeda-Turner proposal and this court's reaction to it. Costs are divided into *fixed costs* (those that do not vary with changes in output) and *variable costs* (which do so vary). *Total cost* is the sum of fixed and variable costs. *Marginal cost* is the increment to total cost that results from producing an additional unit of output. *Average cost,* or *average total cost,* is obtained by dividing total cost by output. Likewise, *average variable cost* is the sum of all variable costs divided by output. Average cost

---

total cost. The district court held that the adjustments were inappropriate. *Transamerica Computer,* 481 F.Supp. at 998–1001. Transamerica does not appeal this ruling.

Transamerica also asked the district court to include "impact costs" in calculating IBM's profits. Impact costs are the "reduction in anticipated future profits on an existing product line caused by the introduction of a new product line." *In re IBM Peripheral EDP Devices Litigation, Transamerica Computer Co. Inc. v. IBM,* 459 F.Supp. 626, 631 (N.D.Cal. 1978). The district court ruled before trial that impact costs should not be included in calculating total costs because to do so would create a disincentive to research and innovation and because impact costs are difficult to calculate. *Id.* Despite this pre-trial ruling, Transamerica was allowed to introduce evidence of impact costs. Transamerica Brief at 21, 50; 72 Tr. 12445–519, 73 Tr. 12541–47, 12568–97, 12614–19, 12645–50, 12666–87. Transamerica does not contend on appeal that it was precluded from introducing any evidence on impact costs. Although evidence of impact costs was before the district court, it did not discuss such costs in reaching its findings of fact on Transamerica's predatory pricing claim. On appeal, Transamerica contends the district court committed prejudicial error in foreclosing consideration of impact costs.

Our review of the record indicates that these costs were speculative. IBM's old products were also being displaced by products produced by PCMs. While IBM might have "lost" profits through the introduction of new products, it arguably would have lost more without the new products. The profits that Transamerica claims IBM could have reaped from its old products might never have been realized by IBM because of competition from the PCMs. In these circumstances, we cannot say that the district court was clearly erroneous in not including impact costs in its calculations. *But see* Ordover and Willig, *An Economic Definition of Predation: Pricing and Product Innovation,* 91 Yale L.J. 8, 26 n. 49 (1981). We do not foreclose the possibility that impact costs ought to be considered when appropriate.

**4.** Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975).

is thus higher than average variable cost for all output levels.[5]

Areeda and Turner suggest that prices be considered *per se* lawful (i.e., non-predatory) if they exceed the defendant's marginal cost or average variable cost,[6] and that prices be considered *per se* illegal (predatory) if they are below marginal or average variable cost.[7] The rationale for this cost-based *per se* test is the belief that a company that makes a profit, however small, on each additional product does so because it is efficient, and should not face antitrust challenges, whereas a company that loses money on the sale of an additional product is doing so presumably for anti-competitive reasons.

The Areeda-Turner test has provoked much judicial and academic comment.[8] This court has been influenced by the Areeda-Turner test without unqualifiedly embracing it. In a series of opinions during the three years preceding the district court's decision reviewed here,[9] we approved the use of marginal or average variable cost in establishing predation without making that mode of proof exclusive, as Areeda and Turner advocate. Indeed, we adopted neither the Areeda-Turner test's conclusive presumption that prices above marginal or average variable cost are legal, nor its conclusive presumption that prices below that cut-off point are predatory. It is true that in *Hanson v. Shell Oil Co.*, 541

**5.** *See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 712, for a full discussion of these terms.

**6.** Areeda and Turner favor using marginal cost as "the economically sound division between acceptable, competitive behavior and 'below-cost' predation." Areeda & Turner, *supra* note 4, at 716. They recognized, however, that marginal cost is usually difficult or impossible to compute and suggested using average variable cost—which is likely to approximate marginal cost—as a surrogate. *Id.* at 716–18.

**7.** Areeda and Turner make an exception where marginal cost exceeds average total cost. In this rare case, the price "floor" for permissible pricing is average total cost. Areeda & Turner, *supra*, note 4, at 713.

**8.** While no courts have explicitly adopted the Areeda-Turner test in its entirety for all cases, a number of courts have adopted elements of the Areeda-Turner test. *See, e.g., Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 87–88 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 431–32 (7th Cir.1980); *Pacific Eng'g & Prod. Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 797 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 637–38 & n. 34 (D.C.Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976); *International Air Indus. Inc. v. American Excelsior Co.*, 517 F.2d 714, 723–25 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).
The Areeda-Turner test also generated a number of counter proposals for evaluating predatory pricing. Sullivan, for example, suggests that courts look to "human animus" in market conduct. He would focus on the "traces" a predator leaves behind, such as documents containing information about competitors. Sullivan, *Economics and More Humanistic Disciplines: What are the Sources of Wisdom for Antitrust?*, 127 U.Pa.L.Rev. 1214, 1229–30, 1232 (1977).
Joskow and Klevorick suggest a complex cost-based test in which market structure is considered and the defendants have a greater burden to produce documentation of their costs. Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy*, 89 Yale L.J. 213 (1979).
Williamson considers output a more important factor than cost or price. He would prohibit a monopolist confronted with a new competitor from increasing its output for twelve to eighteen months. This restraint would diminish as the entrant gained experience and economies of scale. Williamson, *Predatory Pricing*, 87 Yale L.J. 284 (1977).
For the most recent discussion of these ideas and the Areeda-Turner test see Note, *Predatory Pricing: The Retreat From the AVC Rule and the Search for a Practical Alternative*, 22 B.C.L. Rev. 467 (1981).
*See also* Ordover and Willig, *An Economic Definition of Predation: Pricing and Product Innovation*, 91 Yale L.J. 8 (1981); Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing*, 89 Yale L.J. 1 (1979); Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284 (1977).

**9.** *California Computer Products, Inc. v. IBM*, 613 F.2d 727 (9th Cir.1979); *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

F.2d 1352, 1359 n. 6 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), we spoke of "proof of pricing below marginal or average variable cost" as a "prerequisite to a prima facie showing of an attempt to monopolize." Nevertheless, we suggested that prices above marginal or average variable cost might, in appropriate circumstances, be found predatory, *id.* at 1358 n. 5, and we reiterated that point in *CalComp,* 613 F.2d at 743. We also explicitly denied that prices below marginal or average variable cost were *per se* unlawful. *Hanson,* 541 F.2d at 1359 n. 6. In short, the closest we were willing to move to the Areeda-Turner approach was to acknowledge that a "price set at or above marginal cost should not *ordinarily* form the basis for an antitrust violation." *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d at 857 (footnote omitted) (emphasis added).

 Any doubt that this circuit rejects the *per se* aspects of the Areeda-Turner test was dispelled in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* — U.S. —, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982), decided after the district court's decision in the instant case. In *Inglis* we explained that prices are predatory when their justification rests, "not on their effectiveness in minimizing losses, but on their tendency to eliminate rivals and create a market structure enabling the seller to recoup his losses." *Id.* at 1035.[10] We emphasized that this standard, "and not rigid adherence to a particular cost-based rule . . . must govern our analysis of alleged predatory pricing." *Id.* Yet *Inglis* did not, as Transamerica contends here, repudiate all cost-based tests. Rather, it laid down a cost-based test for allocating the burden of proof on the predation issue in place of one designed (like the Areeda-Turner test) to resolve that issue conclusively:

**10.** *See also D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.,* 692 F.2d 1245, 1249 (9th Cir.1982).

**11.** Of course, plaintiff initially bears the burden of proving that defendant's price did in fact fall into this category of suspect prices.

[T]o establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect· they might have on competitors.

*Id.* at 1035–36.

**C.** *The Treatment of Prices Above Average Total Cost*

The *Inglis* test, quoted above, addresses only two categories of prices—those below average variable cost (which, under burden shifting, the defendant must prove are nonpredatory)[11] and those above average variable cost but below average total cost (which the plaintiff has the burden of proving are predatory). The *Inglis* test says nothing about how to evaluate prices for antitrust purposes that exceed average total cost. Indeed, *Inglis* explicitly left this question open. 668 F.2d at 1035 n. 30.

In the instant case, the district court, which did not have the benefit of *Inglis* and its clarification of our previous discussions of the Areeda-Turner test, held that prices above average total cost "should be conclusively presumed legal." *Transamerica Computer,* 481 F.Supp. at 991.[12] We disagree for several reasons.

**12.** To this extent the district court was, as it noted, agreeing with Areeda and Turner. *Transamerica Computer,* 481 F.Supp. at 991. It disagreed with them, however, by concluding that prices below average total cost are not *per se* lawful even if they exceed average variable cost. *Id.* at 991–95. The treatment of prices between average total cost and average varia-

■ First, this court has already recognized that prices exceeding average total cost might nevertheless be predatory in some circumstances. The specific example we discussed was "limit pricing," in which a monopolist sets prices above average total cost but below the short-term profit-maximizing level so as to discourage new entrants and thereby maximize profits over the long run. *See* 3 P. Areeda & D. Turner, *supra* ¶ 714b. We explained that "limit pricing by a monopolist might, on a record which presented the issue, be held an impermissible predatory practice." *CalComp,* 613 F.2d at 743. A similar pricing strategy would be for a monopolist to make *temporary* reductions to a level above average total cost but below the profit-maximizing price whenever a new entrant appears ready to enter the market. One or two such reductions could discourage potential entrants in a market that requires sizable initial investments, leaving the monopolist free to raise his prices to monopoly levels. *See* 3 P. Areeda & D. Turner, *supra* ¶ 714c. Such a pricing strategy, like limit pricing, could well be found predatory.[13]

■ Second, the district court's *per se* test rests on the notion that price reductions to average total cost result from efficient production and harm only less efficient competitors. *Transamerica Computer,* 481 F.Supp. at 991. But companies may lower their prices for temporary strategic reasons as well. One critic of the Areeda-Turner test points out that a monopolist can employ price strategies that jeopardize consumers' long-run welfare without lowering prices below average total cost and concludes that "it is unrealistic and even analytically wrong to apply a simple short-run price-cost rule for determining whether exclusionary pricing by a monopolist is socially undesirable and therefore predatory." Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 869, 890 (1976). It may be difficult in many or most instances to assess the long-run consequences of challenged pricing policies.[14] But where those difficulties can be overcome, the law should not prevent plaintiffs from proving antitrust violations.

■ Third, the uncertainty and imprecision inherent in determining "costs" counsel against basing conclusive presumptions on the relation between prices and costs. Assessing those relations for the products of a multi-product firm requires allocating known and estimated costs and revenues among various products. While accounting problems do not warrant ignoring cost figures completely, they do make it unwise to rely *exclusively* on such figures.

■ Finally, we should hesitate to create a "free zone" in which monopolists can exploit their power without fear of scrutiny by the law. A rule based exclusively on cost forecloses consideration of other important factors, such as intent, market power, market structure, and long-run behavior in evaluating the predatory impact of a pricing decision.[15]

---

ble cost has since been settled in this circuit by *Inglis* and is not at issue here.

**13.** We do not mean to suggest that all pricing that is not profit maximizing in the short run is illegal. As we stated in *Inglis,* prices below the level at which profit is maximized "may legitimately be justified on long-term considerations, as long as those do not include the anticipation of enhanced market power as a result of predation." *Inglis,* 668 F.2d at 1034 n. 29.

**14.** *Cf.* Areeda & Turner, *Scherer on Predatory Pricing: A Reply,* 89 Harv.L.Rev. 891, 897 (1976); 3 P. Areeda & D. Turner, *supra* note 5, ¶ 715, at 166–67.

**15.** The Seventh Circuit also recognizes the importance of considering non-price factors in evaluating whether a pricing policy is predatory. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 432 (7th Cir. 1980); *see also MCI Communications Corp. v. American Tel. & Tel. Co.,* Nos. 80–2171, 80–2288, slip op. at —— n. 58 (7th Cir. Jan. 12, 1983). *Cf. Pacific Eng'g & Prod. Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 797 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

This is also the position of the National Commission for the Review of Antitrust Laws and Procedures, Report to the President and the Attorney General (Jan. 22, 1979). As the Deputy Attorney General for the Antitrust Division noted, cost-based tests do not "truly reflect marketplace realities and provide for anticompetitive behavior." He also noted that even

■ For these reasons, we disagree with the district court's conclusion that prices above average total cost should be legal *per se*. Rather, we believe that *Inglis* adopted the proper approach to the use of cost figures in determining whether prices are predatory: cost categories should be used to allocate the burden of proof on the issue of predation. By this approach, we give due weight to the economic considerations which suggest that prices are presumptively lawful if they exceed marginal or average variable cost and presumptively predatory if they do not. And, of course, this approach does not preclude a litigant from introducing evidence sufficient to overcome these presumptions. *Inglis* followed this approach in evaluating prices below average variable cost and prices between average variable cost and average total cost. The logic of the *Inglis* approach applies with equal force in evaluating prices above average total cost.

■ The test for determining the antitrust legality of prices that exceed average total cost should be consistent with the *Inglis* approach and with our view that cost-price relations should not be the exclusive method of proving predation. In addition, the test should be consistent with the economic analysis of Areeda and Turner. Their analysis indicates that prices above average total cost will rarely be predatory.[16] Therefore, it is appropriate to impose on the plaintiff a greater burden of proving that

prices above average total cost are predatory than the burden imposed by *Inglis* to prove that prices between average variable and average total cost are predatory. We therefore hold that if the challenged prices exceed average total cost, the plaintiff must prove by clear and convincing evidence— i.e., that it is highly probably true—that the defendant's pricing policy was predatory.

### D. *The Proper Test Applied to This Case.*

■ While we modify the test applied by the district court, we affirm the court's decision that IBM's pricing policy did not violate the antitrust laws.[17]

The district court found that IBM's prices were above its average total cost. *Transamerica Computer*, 481 F.Supp. at 1002. This finding was not clearly erroneous. Thus, to prevail on its claim of predatory pricing, Transamerica must prove by clear and convincing evidence that IBM's pricing policy unreasonably restricted competition. The exhaustive trial record, containing a plethora of evidence on pricing behavior, market structure, production costs, marketing strategies, and other related information, fails to provide any clear and convincing evidence of predatory pricing.[18] Transamerica did not, for example, introduce evidence that IBM's prices rose once competition had left the market. The only price increases cited by Transamerica were modest increases in the mid-1970s. During that

---

Areeda and Turner "are now troubled by excluding factors like direct evidence of intent." Remarks of Ky P. Ewing, Jr., Deputy Assistant Attorney General, Antitrust Division, before the Fifth Annual Symposium on Antitrust Law, The Southwestern Legal Foundation, Dallas, Texas, on May 9, 1980. [1980] Trade Reg.Rep. (CCH) ¶ 55,936. The report recommends that the Sherman Act should be amended to provide that, although marginal cost should be considered in determining whether prices are predatory, a showing of pricing below marginal cost should not be a prerequisite to make out an attempt to monopolize based on pricing practices. Report to the President at 40.

**16.** Predatory pricing should not be countenanced merely because it would be difficult to detect in situations where price exceeds average total cost. *See Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 432

(9th Cir.1980) ("Section 2 of the Sherman Act makes no exceptions for cases involving administrative difficulty.").

**17.** "We may uphold correct conclusions of law even though they are reached for the wrong reason or for no reason, and we may affirm a correct decision on any basis supported by the record." *United States v. Washington,* 641 F.2d 1368, 1371 (9th Cir.1981), *cert. denied sub nom. Duwamish Indian Tribe v. Washington,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).

**18.** At trial, Transamerica was not precluded from introducing evidence of predatory pricing. The district court's ruling that prices above average total cost are *per se* legal was made after the trial concluded.

inflationary period, however, IBM increased prices on all its products, not just those involved in this case. Transamerica did not prove that IBM engaged in limit pricing.[19] Transamerica simply introduced evidence of an initial price cut, hardly an unusual act in the computer industry or unusual in the face of competition. Transamerica's evidence of predatory pricing falls far short of the type of clear and convincing evidence that would permit the trier of fact to find predatory pricing when prices are above average total cost.

## CONCLUSION

Thus, even assuming that IBM possessed monopoly power in the relevant market, its lease plan, design changes, and pricing policy did not constitute unreasonable restrictions on competition. On this record, IBM was entitled to judgment as a matter of law. Therefore, we need not consider whether the district court erred in finding that IBM did not possess monopoly power, *Transamerica Computer,* 481 F.Supp. at 974–87, or that Transamerica had failed to prove damages. *Id.* at 1010–21.

The judgment is AFFIRMED.

LUCAS, District Judge, concurring:

I agree that the judgment of the district court in favor of defendant should be affirmed. I disagree, however, with the court's modification of the trial court's test for predatory pricing.

Professors Areeda and Turner, in their article, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975), proposed an exhaustive *per se* rule for determining whether pricing conduct should be deemed predatory: (1) prices above reasonably anticipated average variable cost should be conclusively presumed lawful; and (2) prices below reasonably anticipated average variable cost should be conclusively presumed unlawful.[1] In the nearly seven years since this article appeared many courts have considered this suggestion. *See* Spivak, *Monopolization Under Sherman Act, Section 2,* 50 Antitrust Law Journal 285, 313–14 n. 132 (1982). Although it appears that no court has adopted this proposed rule without modification or qualification, many courts have agreed with Areeda and Turner that the relationship between prices and average variable cost is of significance in evaluating pricing behavior under the Sherman Act. *Id.* This court, in *William Inglis & Sons, Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982), made clear that the relationship was to be used to allocate the burden of proof on the issue of predation, rather than to resolve the issue conclusively. In thus modifying Areeda and Turner's suggested rule, the court explicitly declined to address their

---

**19.** While Transamerica contends that it proved that IBM engaged in limit pricing, the evidence suggests otherwise. Limit pricing exists where entry barriers are "great enough to prevent other entry," *Hanson,* 541 F.2d at 1358 n. 5, or are "extremely high," *Pierce Packing Co. v. John Morrell & Co.,* 633 F.2d 1362, 1366 (9th Cir.1980). Here, the district court found that the entry barriers to the peripherals market were "extraordinarily low." *Transamerica Computer,* 481 F.Supp. at 987.

Further, a limit price is designed to deter entry into the market. To be limiting, therefore, the price must generally be below competitors' prices. Here, "IBM's prices did not undercut the PCM's prices, they did not even equal them, they merely closed the gap; the PCM's prices were still lower." *Id.* at 1002.

The evidence also suggests that IBM's prices did not have a limiting effect. A number of companies entered the peripherals market and took substantial business from IBM. *Id.* at 986. The early success of the PCMs suggests that no limit pricing occurred.

Finally, while *CalComp* held that "limit pricing by a monopolist might, on a record which presented the issue, be held an impermissible predatory practice," 613 F.2d at 743, *CalComp* found that IBM's prices did not constitute limit pricing but rather were a lawful response to competition. *Id.* Transamerica's evidence is indistinguishable from CalComp's. As in *CalComp,* we find that the evidence does not indicate that IBM engaged in limit pricing.

**1.** Noting that "marginal cost data are typically unavailable," Professors Areeda and Turner use average variable cost as a surrogate for marginal cost. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 717 (1975).

more modest yet important suggestion that prices above average *total* cost should be conclusively presumed legal.[2] Judge Schnacke found this limited rule to be sound and used it in granting judgment in favor of defendant. In my opinion, the trial court was correct.

In rejecting the approach taken by Judge Schnacke, the court expresses four concerns. First the court points out that under certain circumstances price reductions might properly be labeled "predatory" even though prices never fall to average total cost or below. Two examples are given, both of which have often been discussed by the academics and by the courts: limit pricing and temporary price reductions in an industry with high entry barriers. *See, e.g.,* Areeda & Turner, *supra,* at 705–09; *In re IBM Peripheral EDP Devices Antitrust Litigation, Transamerica Computer Co. Inc. v. IBM,* 481 F.Supp. 965 (N.D.Cal.1979) [*Transamerica Computer*]; Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 869 (1976). The second concern voiced by the court is that the district court erred in assuming that all "price reductions to average total cost result from efficient production and harm only less efficient competitors." *Ante,* at 1387. This, however, merely restates the first concern noted by the court, for the only price reductions not attributable to efficient production which should be labeled "predatory" are those which harm equally or more efficient competitors. These fall into the two categories noted in the above examples. Indeed, the court's final argument, that "we should hesitate to create a 'free zone' in which monopolists can exploit their power without fear of scrutiny by the

law," expresses the same fear voiced in the first two arguments.

The fear that some pricing conduct in the realm above average total cost might have socially undesirable effects in the long run does not, however, necessarily provide an adequate justification for adopting the rule approved by the court. One must also evaluate the practical utility of the rule, the consequences of adopting such a rule, and the advantages which a contrary rule, in this case a *per se* rule, might provide.

The court concedes that pricing conduct above average total cost will only "rarely" have socially undesirable effects and, thus, constitute predation. *Ante,* at 1388.[3] Thus, even absent any practical problems of proof, the court's rule will seldom yield a result different from that which a *per se* rule would yield. The court also recognizes, however, that there will be problems of proof in this area. *Ante,* at 1387 n. 14. It will be extremely difficult if not impossible to prove up facts sufficient to support a finding of predation where prices do not drop below average total cost. *See Transamerica Computer, supra,* 481 F.Supp. at 991. These practical difficulties, combined with the higher burden of proof imposed by the court today, raise a serious question as to whether liability will in fact be imposed in those rare cases in which it might be.

Yet, while the court's rule is likely to have little practical utility, it could well inhibit socially desirable conduct. As Judge Schnacke noted below:

> It would be all but impossible to distinguish between above cost limit pricing conduct and a monopolist's procompetitive reaction to lower priced competitors.

**2.** *Inglis, supra,* 668 F.2d 1014, 1035 n. 30. Average total cost is, by definition, always higher than average variable cost. *See* Areeda & Turner, *supra,* note 1, at 700–01. A *per se* rule tied to average total cost creates, therefore, a smaller area in which pricing conduct will be presumed to be legal than a rule tied to average variable cost. (It is true that average variable cost is used as a surrogate for marginal cost and that marginal cost can, in some unusual cases, exceed average total cost. *Id.* Areeda and Turner modify their marginal cost rule in

these cases, however, to provide that prices below marginal cost are legal if they exceed average total cost. *Id.* at 712–13.)

**3.** Even Spivak, who disagrees vigorously with the price tests put forward by Areeda and Turner, concedes that where prices are above average total cost, courts could "almost invariably" decide the predatory pricing issue on cost data alone. *See* Spivak, *Monopolization Under Sherman Act, Section 2,* 50 Antitrust L.J. 285, 315–16 (1982).

One external characteristic is common to both cases, a lowered price. An attempt to attach liability to the one will surely inhibit the indistinguishable other.

*Transamerica Computer, supra,* at 991 (footnotes omitted). Furthermore, the rule approved by the court may well increase the number of meritless antitrust actions filed: without a reasonable "safe harbor" in which to seek shelter, every monopolist engaged in legal price competition above average total cost will be a potential target for attack by a competitor attempting to prove that its case is one of the rare instances of predatory pricing conduct.

In addition to these shortcomings, it cannot be doubted that the court's rule will increase the difficulty of trying complex antitrust cases. *Cf. Inglis, supra,* at 1063–64 (Judge Wallace dissenting from denial to rehear *en banc* voiced similar concerns with the court's rejection of the marginal cost rule). A *per se* rule, by contrast, would provide a manageable way of significantly simplifying some aspects of many cases.

In addition to the court's fear of monopolist exploitation of the "free zone" above average total cost, the court gives an additional ground for rejecting a *per se* rule: the difficulty of calculating costs. Because such costs are difficult to calculate, the court finds it unwise to base conclusive presumptions on the price-cost relationship. Though difficult, the task of calculating costs is not impossible. As with other difficult factual issues, the finder of fact, aided by expert testimony, will, I believe, be able to determine average total cost with reasonable precision. Thus, I cannot agree that the difficulty of calculating costs warrants rejection of a useful and sound decisional tool such as the *per se* test tied to average total cost.

On balance, I find the limited *per se* rule adopted by Judge Schnacke to be preferable to the test approved by the court today. I would affirm the judgment without modifying the trial court's test for predatory pricing.