JAYS FOODS, INC., a
corporation, Plaintiff,

v.

FRITO–LAY, INC., a
corporation, Defendant.

No. 78 C 4352.

United States District Court,
N.D. Illinois, E.D.

Aug. 1, 1985.

Francis J. McConnell, McConnell, Ruberry & Jansen, Anthony S. DiVincenzo, Campbell & DiVincenzo, John Brezina, David Brezina, Burton, Ehrlich, Brezina & Buckingham, Chicago, Ill., for plaintiff.

Jeffrey Dorman, Kenneth H. Hoch, Earl E. Pollock, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendant.

### MEMORANDUM AND ORDER

MORAN, District Judge.

This action, in which plaintiff Jays Foods (Jays) alleges that it was a victim of predatory pricing, comes before this court ten years after the seminal article by Professors Areeda and Turner which outlined a cost-based definition of predatory pricing. Areeda and Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). Defendant Frito-Lay's (Frito-Lay) motion for summary judgment on Count I requires this court to determine what fealty to give cost-based tests of predatory pricing in light of a decade of judicial responses to the article and its progeny. It also comes in the wake of full and complete discovery. The question, therefore, is whether there is sufficient evidence to create triable issues.

### I.

Frito-Lay is a national producer of a full range of salty snack foods such as potato chips and pretzels. Its competitors include regional suppliers of a more limited range of snack foods. Jays is one of these regional competitors. Its primary product is potato chips and its market consists of parts of Illinois, Wisconsin, Michigan and Indiana.

In an antitrust case plaintiff has the burden of establishing the relevant product and geographic markets. *See L.A. Draper & Son v. Wheelabrator-Frye Co.,* 735 F.2d 414 (11th Cir.1984). While Jays' complaint covers several products and geographic markets, for purposes of the motion for summary judgment the relevant geographic market is the Chicago area and the relevant product is potato chips. The summary judgment motion is further focused on the sale of potato chips in supermarkets. Supermarket sales account for over 60 per cent of the total sales of snack foods. The Chicago market is presumably the center of Frito-Lay's allegedly illegal competitive practices, and is the largest market served by Jays.

Potato chip sale levels are related to the amount of supermarket shelf space available to a supplier. Sales levels are also related to promotional incentives given stores and their customers. Sufficient shelf space is also required to introduce new products. Stores allocate shelf space to suppliers on the basis of the sales of each supplier's products.

There seems to be little doubt that in the day-to-day commercial warfare between snack food suppliers the key battle is over shelf space. Frito-Lay believed that the company with the greatest share of potato chip business would control the entire salty snack sections of the supermarkets. Because potato chip sales were the core of the regional competitors' strength, Frito-Lay especially sought to increase its market share of potato chips. In its complaint Jays alleges that Frito-Lay provided misleading and inaccurate market studies to major retailer chains in order to increase its share of shelf space at the expense of other competitors. Frito-Lay also allegedly engaged in advertising and promotional practices which helped it to secure additional shelf space. Finally, Frito-Lay allegedly used its dominance in the corn chip market as leverage to induce stores to provide additional shelf space for its other products.

During the 1974–1980 period which is the subject of this lawsuit,[1] Jays was the larger of the two potato chip suppliers in the Chicago area. During the same period Jays was apparently attempting to expand into other salty food product lines and become a supplier of a full range of snack products. Both companies' sales grew during this period. In 1974 Frito-Lay's Chicago division had total sales of $7,559,630 and showed a loss of $35,329. By 1980 its sales had nearly doubled to $13,545,170 and its profits had reached $1,057,830. The record does not contain figures for Jays' performance in the Chicago market. Jays' total net sales grew from $22,970,172 in 1974 to $44,352,969 in 1980. Jays' pretax profits rose from $139,749 in 1974 to $2,319,620 in 1977, before tapering off to $948,557 in 1980. The record does not indicate what shifts occurred in each company's share of the Chicago potato chip market.[2]

The record makes clear that Chicago was one of the "problem" markets for Frito-Lay. Frito-Lay faced strong local competition in potato chip sales and its performance lagged relative to other markets. Consequently, Frito-Lay devoted extra promotional and advertising resources to the Chicago market. These promotions included substantial price discounts, some of which were unauthorized, and a strong emphasis on potato chips in the supermarket display shelves ("overfacing").

The record suggests that Frito-Lay set its prices with an eye towards competitive conditions. A summary of Frito-Lay's pricing objectives identified three approaches to pricing based on market conditions. In high-growth product categories, where Frito-Lay had market leadership, prices were to be set "most aggressively." In low-growth categories, where Frito-Lay had shared market leadership, prices were to be less aggressive. Finally, in "low-growth categories where we do not dominate we will price competitively (*e.g.* potato chips)."

What is also evident from the record is that Frito-Lay's guide in setting prices was its corporate financial goals. Its pricing decisions were "designed to maintain total corporate gross margin at target level of 50%."

According to Jays, Frito-Lay also sold potato chips in Chicago for a lower profit in order to increase its market share. Frito-Lay purportedly was willing to lower its profit in Chicago and other problem markets because it could subsidize these lower profits with the higher profits earned in markets where it faced little or no competition. Frito-Lay's prices for identical products varied from market to market, at least in part because Frito-Lay took over regional companies with established price patterns. Regional price variations also resulted from the different competitive condi-

---

**1.** Jays filed its complaint on Nov. 3, 1978. Frito-Lay argues and Jays concedes that the four-year statute of limitations, 15 U.S.C. § 15b, bars Jays from recovering damages suffered prior to Nov. 3, 1974.

**2.** Frito-Lay apparently had more than a 25% share of the potato chip market by mid-1978. By the late 1970s Jays potato chips outsold Frito-Lay potato chips within Chicago, but Frito-Lay had a 55% share of the total salty snack food business in Chicago while Jays' share of that market was 24%.

tions faced by Frito-Lay in various markets. Frito-Lay prices for some potato chip products in the Chicago market were lower for significant periods than prices for the same products in other markets.

Jays' first amended complaint contains three counts. Count I alleges that Frito-Lay has engaged in predatory pricing in violation of Section 2 of the Sherman Act. Count II is brought under Section 2 of the Clayton Act and alleges that Frito-Lay has engaged in illegal price discrimination. Count III contains pendent claims brought under the deceptive trade practices laws of the states served by Jays and alleges that Frito-Lay engaged in anti-competitive conduct. Jays claims that it sustained a loss totalling $4,311,806.73 for fiscal years 1975–1981, because of its inability to increase prices to reach a 6% pre-tax rate of return as a result of Frito-Lay's anti-competitive conduct.

## II.

In Count I Jays claims that Frito-Lay attempted to monopolize the Chicago market for potato chips in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2. The elements of an attempt to monopolize are (1) intent to control prices or destroy competition with respect to a part of commerce; (2) predatory or anti-competitive conduct directed at accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir.1980).

The parties agree on the definition of predatory pricing as the dominant firm's deliberate sacrifice of current revenues through lower prices for the purpose of driving rivals out of the market. Once it has vanquished its rivals, the dominant firm can more than recoup its short-term losses through higher profits earned in the absence of competition. *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1112 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The parties disagree on the proper test for predation,

namely, the sufficiency of cost-based measures of predation and the relevance of non-cost indicia of predatory intent.

The modern era of predatory pricing analysis was ushered in by Professors Areeda and Turner. Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975). They argued that prices at or above marginal cost, even if not profit-maximizing, generally should be presumed to be non-predatory. *Id.* at 711. Marginal cost is the "increment to total cost that results from producing an additional increment of output." Because marginal costs are difficult to determine, Areeda and Turner advanced average variable cost as an acceptable surrogate for marginal cost. *Id.* at 716–718. Variable costs are costs which vary in a short run with changes in output. Such costs include items such as materials, labor, fuel, use depreciation, and a return on investment needed to attract enough working capital to pay for variable costs. Average variable cost is total variable cost divided by output. Fixed costs, in contrast, are costs which in the short run do not vary with changes in output. Fixed costs include such items as management expenses, interest on bonded debts and other items of irreducible overhead. Total cost is the sum of fixed and variable costs and average total cost is the total cost divided by output. *See generally Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76 (2d Cir.1981).

The Areeda & Turner formula has won wide if cautious acceptance by the courts. Some courts have hewed closely to average variable cost as the conclusive test of predatory pricing. *See e.g. Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir.1983); *Northeastern Telephone, supra.* Most courts have recognized the central importance of a cost-based test of predatory pricing, but have noted that in unusual circumstances special market characteristics, such as high entry barriers, might permit a finding of predatory pricing even if prices were above average variable

cost but below average total cost. *See e.g. Chillicothe Sand & Gravel*, 615 F.2d at 431–32; *Pacific Engineering & Production Co. v. Kerr McGee Corp.*, 551 F.2d 790, 797 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 723–25 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). The Ninth Circuit has strayed most from sole reliance on a cost-based test of predation. *See Transamerica Computer Co., Inc. v. IBM Corp.*, 698 F.2d 1377 (9th Cir. 1983). *See also D.E. Rogers Associates, Inc. v. Gardner-Denver Co.*, 718 F.2d 1431 (6th Cir.1983), *cert. denied* — U.S. —, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). In *Transamerica* the court held that by reference to non-cost factors a plaintiff could show that a defendant engaged in predatory pricing even if its prices were above average total cost. *Id.* at 1386–88.[3]

In *Chillicothe Sand & Gravel* the Seventh Circuit recognized the centrality of the average variable cost test in the analysis of a predatory pricing claim. It cautioned, however, that non-cost factors were not to be neglected when determining whether a defendant's pricing policy was predatory:

> [W]hile we accept the use of marginal or average variable cost as both a relevant and an extremely useful factor in determining the presence of predatory conduct we are willing to consider the presence of other factors in our evaluation of whether or not plaintiff has made out a prima facie case of monopolizing or attempt to monopolize.

615 F.2d at 432. Indeed, after concluding that defendant's prices were above average variable cost, the *Chillicothe* court went on to consider and ultimately to reject a varie-

ty of non-cost factors which plaintiff had argued revealed defendant's predatory intent. *Id.* at 432–34.

In *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), the Seventh Circuit confronted allegations that AT & T had engaged in predatory pricing of two of its services for long distance business communications. *MCI*, 708 F.2d at 1111. The issue at *MCI* was not the validity of the Areeda and Turner average variable cost test; neither party ever argued for application of a short run cost standard. 708 F.2d at 1115. While *MCI* noted some of the shortcomings of the average variable cost test, *id.* at 1115–16, the decision cannot be read as a repudiation of that test. In fact, the court expressly stated that "pricing below average variable cost is normally one of the most relevant indications of predatory pricing." *Id.* at 1120, n. 55.

Perhaps the strongest and most repeated criticism of the average variable cost test of predatory pricing is its focus on short term rather than long term costs. *See e.g.* Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv.L.Rev. 869, 890 (1976). Then Professor Posner, for example, recognized the usefulness of the Areeda and Turner average variable cost formula, but concluded that predatory pricing also exists when a company sells its product below its long-run marginal cost with the intent to exclude a competitor. R. Posner, *Antitrust Law*, at 189. Long-run marginal costs are costs that must be recovered in order for a business to survive into the indefinite future. *Id.* Because all costs are variable in the long run, long-run marginal costs include both the fixed and variable components of short-term costs.

**3.** Courts generally have held that plaintiff makes out a prima facie case of predatory pricing by showing that defendant's prices fell below average variable cost and are thus presumptively predatory. When prices are above average variable but below average total cost plaintiffs must rebut the presumption that the prices are not predatory. *See generally William Inglis & Sons Baking Company v. ITT Continental Baking Company, Inc.*, 668 F.2d 1014, 1035–36 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). The *Transamerica* court set plaintiff's burden even higher when defendant's prices are above average total cost. 698 F.2d at 1388.

In *MCI* the court adopted the long-run incremental cost of providing the two long distance services as the standard by which to determine if AT & T's prices were predatory. The long-run incremental cost of producing a product is total company cost minus what the total cost of the company would be in the absence of manufacturing the product, divided by the quantity of product being manufactured. *See* Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing*, 89 Yale L.J. 1, 9, n. 26 (1979). Long-run incremental cost includes fixed as well as variable cost of both capital and operating items. Unlike measures of fully distributed cost, long-run incremental cost is calculated with reference to current and anticipated cost, rather than historical or imbedded cost. *MCI*, 708 F.2d at 1116–18. The long-run incremental cost test, in short, measures the costs caused by the production of a product. *Id.* at 1116. Other courts have been slow to adopt the long-run incremental cost approach.

*MCI* is also important for its discussion of the role of non-cost factors in the analysis of predatory pricing. The court's most complete statement on the issue was:

> We do not intend to imply that in *all* cases and in *all* circumstances we would only examine the price-cost relationship of a product or service. Our test merely suggests that a judge and jury may not *infer* predatory intent unless price is below long-run incremental cost.... [However,] a strong presumption of lawfulness must attach when price is shown in a case like this one to be an appropriately derived measure of incremental cost.

708 F.2d at 1123, n. 59 (emphasis in original).[4]

The legacy of *Chillicothe* and *MCI* is clear but incomplete. There are two cost-based tests for predatory pricing. The average variable cost test focuses on short-term cost. The long-run incremental cost

test measures the long-term cost caused by the production of product. While non-cost factors are important adjuncts to the cost-based tests, the cost tests play the central role in the analysis of predatory pricing. The Seventh Circuit has not indicated if it will follow the Ninth Circuit in holding that prices above short-run total cost may in some circumstances be predatory. It reasonably can be implied from *MCI* and *Chillicothe*, however, that prices above average variable cost but below average total cost might be predatory in light of striking non-cost indicia of predation or unusual market conditions.

### III.

For a predatory pricing action of this magnitude, the data on prices and costs are disconcertingly meager (Ex. 41). Plaintiff concludes that "since Frito-Lay does not regularly isolate total cost for any division, including Chicago, these [cost] records do not permit the determination of costs for potato chips sold in Chicago." In its brief plaintiff devotes six pages demonstrating that the cost data are incomplete and capable of various interpretations. Plaintiff's position is that as a matter of law it need not show that Frito-Lay priced potato chips below applicable cost levels or, alternatively, that the inadequacy of the cost data precludes summary judgment. Defendant argues that it is entitled to summary judgment because the plaintiff has not marshalled cost data in acceptable form and because the existing data indicates that its prices were not predatory.

The key piece of cost data is a "total cost study" covering the years 1974–1980, which plaintiff prepared for use in cross-examining the defendant's expert. The study shows that Frito-Lay's total costs were generally under its revenues. Plaintiff explains that the cost study is inaccurate because it relies upon overly conservative methodological assumptions. Plaintiff stated that it intended to provide better and

---

**4.** There is no indication that the MCI decision requires any different treatment of non-cost factors when the long-run incremental cost test is employed. rather than the average variable cost test is employed.

presumably more favorable cost data at a later date, though it has provided relatively little in the many months during which Frito-Lay's motion has languished.

The cost study purports to show the total cost of manufacturing, promoting and selling potato chips in Frito-Lay's Chicago division. The total cost figures includes the amounts expended upon (1) manufacturing, (2) selling and freight, (3) advertising and merchandising, and (4) general and administrative expenses. The study, which is broken down into four-week periods, reveals that Frito-Lay lost $459,275 in 1974 and $292,521 in 1975, and showed profits of $75,819, $7,022, $303,787, $186,524 and $1,057,830 in the years 1976 to 1980, respectively.

### A. *Average Variable Cost*

The cost study is flawed as an indicator of average variable cost. For example, it does not differentiate between the fixed and variable components of total cost. On its face, however, the study suggests that Frito-Lay's average variable cost did not regularly exceed its per unit prices. First, because average variable cost is but a part of total cost, Frito-Lay could not have been selling above variable cost in the years (1976–1980) in which its sales revenue exceeded its total cost. Second, the 3% difference between sales revenue and total cost in 1975 would almost certainly be substantially less than the percentage of total costs which were fixed.[5]

Plaintiff has undertaken its own analysis of average variable cost for a single four-week period in 1976 (Ex. 68). It determined that average variable cost exceeded sales revenue by $3,559 during the period. When viewed in context, this finding actually supports defendant's position. First,

plaintiff considered 99% of total manufacturing cost and 98% of total non-manufacturing cost during the period to be variable, surely an over-estimation given the short time span. Second, according to the total cost study, Frito-Lay's loss during this four-week period was its third worst of the 91 periods covered by the study. Frito-Lay's loss during this period fell under the 1974 profit/loss average by $42,571. Corresponding figures for the years 1975 through 1980 were $58,856, $153,719, $84,922, $100,977, $169,227 and $236,196, respectively. That Frito-Lay's revenues fell below average variable cost by only $3,559 in such an abysmal performance period, and that this figure is based upon questionable methodological assumptions, can only mean that Frito-Lay's prices were above average variable cost in almost all other periods.[6]

Plaintiff appears to suggest that it is entitled at a minimum to recover treble damages for each four-week period in which Frito-Lay's potato chip revenues fell below its total cost for the same period. Average variable cost and not total cost is, however, the short-run cost measure. Even assuming that Frito-Lay's average variable cost was above its revenue during some four-week periods—a questionable assumption given plaintiff's designation of all but a miniscule percentage of cost as variable—it is doubtful whether plaintiff is entitled to base its recovery on such short-term perturbations. It is unclear from the cost study what degree of correspondence there is between the revenue derived from sales during the period and the costs allocated to that period. More importantly, given the relatively long periods between Frito-Lay's price changes (Ex. 5), and the short-run fluctuations in costs shown in the cost

---

5. The cost study shows that Frito-Lay's revenues exceeded its total cost for the last eight weeks of 1974.

6. In 1981 Price, Waterhouse & Company prepared an analysis of a contribution made by the sale of potato chips in the sale zone which included Chicago. The study found that the potato chips made a positive contribution on a variable cost basis each year during the 1974–

1980 period. That is, for the zone as a whole, Frito-Lay was selling its potato chips above its average variable cost. Plaintiff's theory, of course, is that Frito-Lay was selling its supermarket potato chips below its average variable cost in Chicago, even though its potato chips prices may have exceeded average variable cost throughout the zone as a whole.

study, it is not evident that Frito-Lay priced below its *reasonably anticipated* average variable cost. *See* Areeda & Turner, *Antitrust Law,* ¶ 715(d) at p. 174.

While marginal cost generally is below average total cost, at high levels of production where production facilities are operating beyond optimum capacity marginal costs may be above average total cost. Areeda & Turner, *Antitrust Law* (1982 Supp.) ¶ 715.4(c) at p. 155. In rare cases a defendant who operates a plant well beyond its optimum capacity may be engaged in predatory pricing even while earning significant profits. *Id.* at 156.

Plaintiff suggests that Frito-Lay's production facilities were being utilized at the level well over optimum capacity during the relevant period. The evidence is far from conclusive in this regard. Plaintiff has produced evidence which indicates that Frito-Lay officials were concerned about expanding snack food production facilities nationwide to keep pace with growing demand. The record also shows that there were spot shortages of Frito-Lay products in some areas due to strikes, poor materials, bad weather, and, on occasion, capacity constraints due to spurts in demand caused by promotions. The existence of spot shortages does not necessarily indicate that production facilities were over-utilized. In fact, Frito-Lay could well have decided to have spot shortages rather than to utilize production facilities uneconomically at well over optimum capacity.

The only hard evidence of the utilization of Frito-Lay's potato chip production facilities nationwide does not indicate sustained production at over-capacity levels. Records from 1979 show that Frito-Lay operated its potato chip production facilities at over 100% of capacity for only two weeks and production levels during these weeks never exceeded 105% of capacity. The running average for capacity utilization for the year never exceeded 90%. Capacity utilization records for the first half

of 1980 show only one big jump during a single week to 100% capacity utilization. Capacity utilization over the six four-week periods averaged only 77.4%.

This data is of limited use because of its nationwide scope. The only information about production levels at the Allen Park plant, the largest supplier of potato chips for the Chicago market, suggests that in 1979 and 1980 capacity well exceeded demand. In 1979 capacity was 5900 units, while demand was projected to be 2,731 units. In 1980 capacity was unchanged and demand was expected to rise to 3,085 units. Projected demand was well under capacity of the Allen Park plant through 1983.[7]

While establishing that Frito-Lay was concerned about maintaining adequate capacity in the face of rising demand and that a variety of circumstances led on occasion to spot shortages, plaintiff has done no more than establish that in three out of seventy-six weeks Frito-Lay's plants nationwide were operating at over 100% but under 110% of capacity. During a good portion of the same period demand was apparently less than 50% of capacity at the plant which supplied most of the potato chips to the Chicago market. Even assuming that marginal costs did exceed average total costs during several weeks—a questionable assumption given the slight extent of the production over capacity—and assuming that the Allen Park plant was over-utilized—a fact for which there is no support—this court would be reluctant to base liability on such short-term periods of production over capacity levels. Such an approach would be inconsistent with the purpose of the antitrust laws. Companies would be reluctant to engage in vigorous price competition if they faced treble damages for each period, no matter how short, that their prices happened to fall below their marginal cost because of unusually high production levels. *Cf. Barry Wright Corp.,* 724 F.2d at 234 (arguing against too

7. The Allen Park plant was somewhat more inefficient that most other Frito-Lay plants. Plaintiff points out that cost study, which may not have fully accounted for the inefficiencies of the Allen Park plan, may thus understate actual cost.

rigid an adherence to economic principles in antitrust analysis).

The shortcomings of plaintiff's position might be overcome by three factors. First, there is no evidence in the record as to the utilization of Frito-Lay's potato chip plants during much of the period covered by the lawsuit. Perhaps capacity constraints were greater from 1974 through 1978. Second, not all the potato chips for the Chicago market were produced at the Allen Park plant. Conceivably, production levels at the other plants supplying Chicago were substantially above capacity. Third, the optimum capacity of the Frito-Lay plants could have been below the full capacity level established by Frito-Lay. The existing plant utilization data thus might understate the extent to which production exceeded optimum capacity. Yet, after extensive discovery, plaintiff has not been able to advance evidence in support of any of these suppositions.

### B. Long-Run Incremental Cost

The data is even more unsatisfactory with respect to long-run incremental cost. Both parties agree that plaintiff's cost study is a measure of fully distributed costs. The Seventh Circuit has rejected fully distributed cost as a standard with which to examine a company's long-term pricing policy. MCI, 708 F.2d at 1119–23. In some circumstances fully distributed costs may be an acceptable proxy for long-run incremental costs. See MCI, 708 F.2d at 1116, n. 47. For example, the average balance sheet cost of a single product enterprise in a stable economy may provide an acceptable proxy for long-run incremental cost. Id. Frito-Lay, however, produces numerous products. During the period covered by the lawsuit the economy was not stable. The potato chip market itself was dynamic and Frito-Lay was making significant capital expenditures in new plants in order to meet rising demand.

One can draw suppositions from the data in favor of both parties. For example, in its supplemental memorandum Jays presents a revised cost study which adds the costs of attracting investment capital to the tally of total costs. Capital costs are properly included in the calculation of long-run incremental cost. MCI, 708 F.2d at 1118. As revised, plaintiff's cost study shows that Frito-Lay's total cost of producing potato chips for the Chicago market exceeded its revenues. Moreover, plaintiff's cost study may understate the actual and anticipated costs from which the long-run incremental cost figure is derived.

On the other hand, as defendant points out, the total cost study may significantly overstate the costs attributable to the production of potato chips for the Chicago market. Long-run incremental costs include only those costs attributable to the production of a particular product. Apparently, not all of the costs which Frito-Lay would have incurred even if it were not producing potato chips have been deducted from the total cost study. For example, the administrative expenses which Frito-Lay would have incurred in the absence of supermarket potato chip lines might not have been significantly different than the amount of administration expenses shown in the total cost study. If so, the figures for administrative expenses are substantially inflated for purposes of a measure of long-run incremental cost. In sum, the data is so fragmentary that no meaningful judgment can be made as to whether Frito-Lay priced its supermarket potato chips beneath its long-run incremental cost.

### IV.

Jays' position is that non-cost factors alone can be determinative of Frito-Lay's liability. Chillicothe and MCI cast substantial doubt on this position, at least in the usual predatory pricing case. Yet, the decisions do require consideration of non-cost factors in conjunction with the application of cost-based measures of predation.

### A. Profit Cross-Subsidization

Jays has assembled evidence that Frito-Lay set prices on a regional basis. In regions where Frito-Lay had relatively little competition, prices were set higher than

in regions like Chicago, where Frito-Lay faced vigorous competition. Jays argues that Frito-Lay compensated for the lower profits it earned in Chicago by charging higher prices elsewhere. According to Jays, Frito-Lay's lower prices in Chicago were predatory. In *MCI* the Seventh Circuit considered and rejected an identical profit cross-subsidization theory. The court stated that the so-called subsidization of low prices in competitive markets by higher prices in less competitive markets was actually a chimera, as long as the price in the competitive market exceeded long-run incremental cost in that market:

> When a multiproduct firm prices a competitive service above its long-run incremental cost, no cross-subsidy can occur because the additional revenues produced exceed all additional cost associated with the competitive service and provide a contribution to the unallocable common cost otherwise borne by the firm's existing customers.

*MCI*, 708 F.2d at 1124. Assuming that Frito-Lay's potato chip prices in Chicago were set above long-range incremental cost, no cross-subsidization occurred for which liability could attach on a monopolization theory.

### B. *Profit Maximization*

In a position related to the theory of price cross-subsidization, Jays argues that Frito-Lay's purported failure to maximize its profits in Chicago was conclusive evidence of predatory pricing. The *MCI* court left no doubt of its rejection of the profit maximization theory:

> [W]e must reject such "profit maximization" theory as incompatible with the basic principles of antitrust. The ultimate danger of monopoly power is that prices will be too high, not too low. A rule of predation based on the failure to maximize profits would rob consumers of the benefits of any price reductions by dominant firms facing new competition. Such a rule would tend to freeze the prices of dominant firms at the monopoly levels and would prevent many pro-competitive price cuts beneficial to consumers in other purchases.... It is in the interests of competition to permit dominant firms to engage in vigorous competition, including price competition. We therefore reject *MCI*'s "profit maximization" theory and reaffirm this circuit's holding that liability for predatory pricing must be based upon proof of pricing below cost.

*MCI*, 708 F.2d at 1114 (footnote and citations omitted). In this case Frito-Lay was not even the largest supplier of potato chips for the Chicago market. Its adoption of non-profit maximizing prices in response to Jays' competitive challenge was thus more reasonable and more necessary than if it had been the dominant supplier.

### C. *Entry Barriers*

Jays describes the barriers to entering the snack food market as "almost insurmountable." As common sense suggests, supermarket sales of potato chips depend to a large extent upon the shelf space allocated to a supplier. A supplier needs adequate shelf space to compete successfully in the cacophony of kinds, colors, shapes and sizes of the various snack food products and their packages. Too little shelf space creates difficult supply problems requiring frequent restocking. Inadequate shelf space will also hinder expansion into new product lines. Supermarkets allocate shelf space on the basis of sales. Because they allocate shelf space relatively infrequently, and because of the tie between shelf space and sales, shelf space once lost is difficult to regain. Getting shelf space in the first place can be a daunting task.

Jays' position is that the link between sales and shelf space, the difficulties in recapturing lost space, and the obstacles to gaining access to supermarket shelves, create a substantial barrier to entry into the Chicago potato chip market. This barrier was important for two reasons. First, because barriers to entry protect the inflated profits of a monopolist, the attractiveness of predatory pricing is directly proportional to the height of the barriers. Second, Jays

argues that the efforts taken by Frito-Lay to increase its allocation of shelf space reflects Frito-Lay's predatory intent.

In the absence of substantial evidence to the contrary, this court has doubts as to whether the purported entry barriers caused by shelf space limits are unusually high for potato chips. Presumably all products for which supermarket sales are important can be said to have equally high entry barriers. Assuming the existence of entry barriers, it is also unclear whether Jays, the largest potato chip supplier in the Chicago area, faced unusual difficulties in maintaining or expanding its share of supermarket shelf space or in penetrating into new supermarkets.

*MCI* appears to minimize the importance of high entry barriers in the analysis of predatory pricing. Some courts have held that high entry barriers may make prices above average variable cost but below short run profit maximizing levels predatory. *See e.g. International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 724 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). The *MCI* court did suggest that in some circumstances a short-run average variable cost test might be inappropriate where entry barriers are high, 708 F.2d at 1121, n. 57. Yet, the court indicated that high entry barriers did not affect the viability of a measure of average total cost, such as the long-run incremental cost test. Indeed, entry barriers may not even have to be considered when the long-run incremental cost test is employed:

> An important, but presently theoretical, issue not directly before this court is the propriety of using short-run marginal cost (as opposed to some measure of average total cost) in predatory pricing cases involving industries with high entry barriers ... there is some evidence that barriers to entry may be high in the long distance telecommunications field. There is also evidence, however, that the development of microwave technology has significantly lowered these barriers. *Because the parties here have argued from measures of average total cost we do not reach this question.*

*Id.* (emphasis added) (citation omitted). The *MCI* court never considered the effects of entry barriers as part of its application of the long-run incremental cost test.

In this case it is near certain that Frito-Lay priced its potato chips above average variable cost. When all inferences are drawn in plaintiff's favor it appears, however, that entry barriers in the Chicago market might be high enough to cast some doubt on the propriety of strict adherence to the average variable cost test in the face of convincing non-cost evidence of predatory behavior. *MCI* seems to indicate that the long-run incremental cost test is unaffected by the presence of high entry barriers. Here the long-run incremental cost data is too rudimentary for a supportable conclusion that there has been predation.

Jays also points to evidence of anti-competitive efforts by Frito-Lay to increase its share of supermarket shelf space. When all inferences are drawn in Jays' favor, it appears that some Frito-Lay employees may have attempted to buy extra shelf space and to sabotage supermarket tests of snack food sales in order to obtain more space. While such evidence, if true, is not conclusive of liability, this being after all a predatory *pricing* case, it has some weight as circumstantial evidence of a predatory scheme.

**D.** *Expressions of Predatory Intent*

Jays has culled from the Frito-Lay files various expressions of competitive combativeness by Frito-Lay employees. Courts are to approach purported expressions of predatory intent by company officials warily:

> Even if it were possible to identify those persons within a firm whose intentions are relevant, the meaning of the evidence will usually be obscure. After all, competition consists of winning business from rivals. The intent to preserve or expand one's market share is presumptively lawful. To encourage judges

and juries to rely overly on non-probative data allegedly bearing on a firms "state of mind" invites the twin mischiefs of (1) burdening the litigation with thousands of documents about the firm's motives and calculations, and (2) encouraging inconsistent and quixotic results. *MCI*, 708 F.2d at 1113.

The closest the evidence comes to a "smoking pistol" is a statement in a memorandum:

> *Maximum Impact on Competition* —By placing incremental effort behind these low share markets, we would maximize the effectiveness of our spending, since these markets account for 77% of the volume of our top five competitors and 77% of all branded competition. This is significant since the bulk of our major competition's volume/profit comes from their potato chip business. *Focusing our efforts on potato chip growth is most likely to hinder aggressive competitive expansion.* (emphasis added)

This statement, however, is part of a discussion of where Frito-Lay should focus its promotional resources and is not directly connected to Frito-Lay's pricing policy. It is alone far from conclusive on the issue of whether Frito-Lay engaged in predatory pricing. The remaining intent evidence appears to be primarily naive expressions of competitive zeal. In short, the existing evidence of predatory intent has only some limited weight as corroborative circumstantial evidence of Frito-Lay's predatory intent. Standing by itself, the intent evidence is wholly insufficient to establish Frito-Lay's predatory intent.

### E. *Price and Promotional Discrimination*

Jays provide some evidence that Frito-Lay ran promotions featuring price discounts longer in Chicago than in other markets and generally devoted more merchandising resources to the zone of which Chicago was a part. Even if true, these things do not necessarily indicate predatory pricing. The same principles that apply to Jays' product maximization and profit price cross-subsidization arguments apply in this instance. So long as Frito-Lay priced potato chips above its average variable cost and its long-run incremental cost, then there is no compelling reason to deny Chicago consumers the benefits of longer and greater promotional discounts. While the social benefits of increased advertising might be debated, there is nothing inherently predatory about heavy advertising in highly competitive markets.

### V.

■ Courts generally approach summary disposition of complex antitrust cases with caution. *See Lupia v. Stella D'Oro Company, Inc.*, 586 F.2d 1163 (7th Cir.), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). This is especially true in antitrust cases where motive and intent play leading roles. *Feldman v. Health Care Service Corp.*, 562 F.Supp. 941 (N.D. Ill.1982). If, however, after completion of discovery it is clear that the plaintiff will not be able to establish an essential element of its claim, summary judgment in defendant's favor is warranted. *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Companies*, 682 F.2d 660 (7th Cir.1982).

The parties have completed discovery and filed a massive pretrial order. If the court denies Frito-Lay's motion for summary judgment the parties will go to trial using exactly the same body of evidence that they have drawn upon for their briefs. This trial is optimistically estimated to last six weeks. It will expose Frito-Lay to treble damages.

■ Jays simply has failed to make out even the outlines of a case of predatory pricing. *MCI* makes clear that an essential element of a predatory pricing case is proof that defendant's prices were below average variable or long-range incremental costs. After completing its discovery and after having many months to send legions of experts through the thickets of cost data, plaintiff has failed to come close to satisfying either cost standard. In fact, to the extent it is usable, the available cost data

indicates that Frito-Lay's pricing policy was not predatory.

Jays rests its case upon the legal proposition that non-cost evidence can support a predatory pricing claim. A weak pricing case can perhaps be rescued by convincing non-cost evidence. But here plaintiff's pricing data is anemic at best and its non-cost evidence is unilluminating.

Because it is based largely upon empirical factors, predatory pricing analysis does not depend upon considerations of motive and intent. That barrier to summary judgment is thus not at issue. Now that the pretrial order is entered there is no possibility that Jays can divine cost figures or uncover non-cost evidence that reveals predatory pricing. Even though it has made a Herculean effort, Jays has advanced a case that rests largely upon speculation and conjecture. In order to avoid presenting a jury with such a case, the court has no option under the circumstances but to grant Frito-Lay's motion for summary judgment.

## VI.

Count II is brought under the Robinson-Patman Act, 15 U.S.C. § 13(a), which provides that

> it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce.

Plaintiff moves for summary judgment on that count.

There are three contested issues with respect to Jays' Robinson-Patman Act claim: whether Frito-Lay (1) discriminated in price; (2) in the sale of goods of like grade and quality; (3) such that competition was substantially lessened. Plaintiff's

motion is directed only at the first two issues. For purposes of the motion Jays focuses only on the sale in the Chicago market of supermarket-sized products within the categories of (1) Lays/Frito-Lays; (2) Ruffles; and (3) flavored potato chips.

■ The extent to which a product is of like grade and quality as another product depends on "the characteristics of the product itself." *FTC v. Borden Co.*, 383 U.S. 637, 641, 86 S.Ct. 1092, 1095, 16 L.Ed.2d 153 (1966). In *Borden* the court held that evaporated milk produced and sold under the Borden name was of like grade and quality as that which Borden produced for sale at lower prices under other brand names. The physical and chemical identity of the two products, rather than brand names and consumer preferences, are conclusive of the like grade and quality question. *Id.* at 639–640, 86 S.Ct. at 1094–1095.

Defendant emphasizes the physical differences between the various lines of Frito-Lay products marketed in Chicago and throughout the country. The likeness of grade and quality of, for example, a plain potato chip and a flavored ridged potato chip presents a genuine issue of fact which cannot be resolved upon a motion for summary judgment. *See Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876, 888–89 (S.D.N.Y.1968), *aff'd* 405 F.2d 319 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Jays' motion, as this court understands it, is directed instead towards establishing only that the various lines of supermarket-sized Frito-Lay products sold in Chicago were substantially identical to the same items Frito-Lay sold in the same supermarket-sized packages outside of Chicago. So, for example, barbecued potato chips sold in supermarket-sized packages in Chicago are substantially identical to barbecued potato chips sold in supermarket-sized packages elsewhere, but not substantially identical to ridged potato chips sold in supermarket-sized packages. The evidence supports this rather unremarkable proposition.

Price discrimination under the Robinson-Patman Act "is merely a price difference." *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). Jays has advanced evidence that Frito-Lay prices for its supermarket-sized products were sometimes lower in the Chicago market than elsewhere. Frito-Lay provides evidence that its prices were sometimes higher in Chicago than elsewhere. Frito-Lay also argues that the price differentials were simply inherited from the local companies which it absorbed. *See Dean Milk Company v. FTC*, 395 F.2d 696, 700–03 (7th Cir.1968). Summary disposition of this issue is unwarranted in view of the uncertainty of the data. It would seem, however, that the parties ought to be able to agree on historical pricing data, thus eliminating the need for evidence on that issue, and perhaps on post-1978 promotional campaign discounts.

### Conclusion

Defendant's motion for summary judgment on Count I is granted. Plaintiff's motion for summary judgment on Count II is granted in part within the parameters as set out in the opinion. Defendant's motion for summary judgment on the Count II price discrimination issue is denied.