**JAYS FOODS, INC., a corporation, Plaintiff,**

v.

**FRITO-LAY, INC., a corporation, Defendant.**

No. 78 C 4352.

United States District Court, N.D. Illinois, E.D.

Feb. 26, 1987.

Anthony S. DiVincenzo, Campbell & DiVincenzo, David C. Brezina, Brezina & Buckingham, Chicago, Ill., for plaintiff.

Earl E. Pollock, Kenneth H. Hoch, Jeffrey L. Dorman, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

On August 1, 1985, 614 F.Supp. 1073, this court granted defendant's motion for summary judgment on count I, holding that there was insufficient evidence, after full discovery, to raise a triable attempted monopolization issue. The court there did not wholly reject reliance on evidence of subjective predatory intent, if there were such, although it emphasized predatory pricing as the key issue and its analysis was primarily focused on the relevant cost measurement. Plaintiff tried again, with a motion for reconsideration. That was rejected on March 31, 1986, with this court again emphasizing cost measurement standards. 635 F.Supp. 103.

Defendant followed with a motion for summary judgment on the remaining two counts. The thrust there was that the Robinson-Patman claim must also be rejected because it too requires predatory pricing analyzed on the same basis as a Section 2 Sherman Act claim. Rather than require full briefing this court suggested that the parties file position papers setting forth what they expected to be able to demonstrate to the court if the issues were fully explored, and they have done so. This court thereafter delayed ruling until it had an opportunity to explore generally the law applicable to Robinson-Patman Act claims, an area with which it had little familiarity. Having done so, this court now grants defendant's motion for summary judgment on count II and denies it on count III.

Plaintiff claims that this court was wrong the first time and, if it wasn't, at least the predation standard for a Robinson-Patman claim is different from that applicable to a Section 2 claim. It rests upon *Utah Pie Co. v. Continental Baking Company*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), and reargues many of its prior contentions.

*Utah Pie* is a slender reed upon which to rely. The development of the law has not been kindly to the plaintiff since this case was filed and, if anything, it has been even less kindly since the 1985 opinion here. The "modern era of predatory pricing analysis ... ushered in by Professors Areeda and Turner" (*Jays Foods, Inc. v. Frito-Lay Inc.*, 614 F.Supp. 1073, 1076 (N.D.Ill. 1985)) was eight years after *Utah Pie*. If *Utah Pie* ever meant that a Robinson-Patman violation can rest upon pricing above an appropriate cost measurement, it has been soundly criticized. *See* Bork, *The Antitrust Paradox*, pp. 386–387 (1978); Areeda & Turner, *Antitrust Law*, ¶ 720c, pp.

189–190 (1978); ABA Antitrust Section, Monograph 4, *The Robinson-Patman Act: Policy and Law, Volume I*, p. 77 (1980). But if it once meant that, it means it no longer. It is illuminating that, with respect to a Sherman Act claim, the Supreme Court in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), defined predatory pricing as chiefly a problem of a single firm, having a dominant share of the relevant market, cutting its prices in order to force competition out of the market, with predatory pricing meaning pricing below some appropriate measure of cost. It declined, in that case, to resolve the debate over what cost measurement is relevant (fn. 8, 106 S.Ct. at p. 1355). The Court relied, however, on cases which had emphasized objective pricing and incremental cost data, referred to *Utah Pie* as generally supporting that proposition, and indicated (in fn. 9) that any theory based upon pricing above an appropriate cost measurement was vulnerable. A similar shift in emphasis is echoed in *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d. 1325 (7th Cir.1986) ("So 'intent to harm rivals' is not a useful standard in antitrust" (p. 1338). "[A] dominant firm may slash prices to marginal cost in an effort to capture patronage" (p. 1339). "The focus must be on the objective basis, not the mental state" (*id.*); *see also Olympia Equipment Leasing Company v. Western Union Telegraph Company*, 797 F.2d 370 (7th Cir.1986) and *The Great Escape, Inc. v. Union City Body Company, Inc.*, 791 F.2d 532 (7th Cir.1986). Finally, *Matsushita* was a forerunner of *Anderson v. Liberty Lobby, Inc.*, 476 U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett*, 476 U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), where the Supreme Court made it clear that summary judgment is a useful tool when the party having the burden of proof cannot sustain its burden after full discovery.

Indeed, the rapid development of the law is well illustrated by one treatise. Von Kalinowski, *Antitrust Laws and Trade Regulation*, ch. 29, vol. 4, dealing with competitive injury under the Robinson-Pat-man Act, appears to have been largely written in 1969 and somewhat revised in 1979. Ch. 10, vol. 3, dealing with predatory practices, appears to have been substantially rewritten in 1985 and discusses fully the differing approaches of the various circuits in the post-Areeda & Turner era. There is an almost total lack of congruency between the chapters. In ch. 10 (10–25, § 10.03(5)), fn. 48, Von Kalinowski notes that *Utah Pie* probably has little present relevance since it predated the "recent flood of predatory pricing writing precipitated by Areeda & Turner's proposal and before a large amount of litigation on the issue. There is a different context of common law and economic theory that the Supreme Court must now consider."

Courts have been unwilling to drop intent as a standard entirely, perhaps because of an understandable reluctance to never say never when the universe is unpredictable, perhaps in deference to the past, or perhaps in recognition that commercial megalomania, even without market power, is, still, without redeeming virtue. *But see Barry Wright Corporation v. ITT Grinnell Corporation*, 724 F.2d 227 (1st Cir.1983). Some courts have been unwilling, also, to follow the logic of an objective predation standard. They have, rather, noted that predatory pricing can lead to an inference of predatory intent which can lead to an inference of the requisite possible effect on competition, *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) or to an inference of a dangerous probability of success in attaining monopolization, *Janich Bros. Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). The relevant cost measurements remain, as the Supreme Court noted, the subject of intense debate, with factors such as entry barriers relevant to that debate.

■ Where does that leave a Robinson-Patman price discrimination claim? The answer is, in one sense, unclear. The statute imposes liability not for price discrimi-

nation but illegal price discrimination, and that requires a possible impact on competition (not just on a competitor, *Henry v. Chloride, Inc.*, 809 F.2d 1334 (8th Cir. 1987)). That is, by its terms, different from the monopolization standard of dangerous probability of success. But if predatory pricing leads inexorably to a presumed danger of monopolization (and, obviously, a presumed threat), the focus necessarily is on the predation standard, at least in primary-line injury cases. And the courts and commentators are now in virtual agreement that the predation standards for Section 2 and Robinson-Patman claims are the same, even though they may disagree over what the standards may be. *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340 (3rd Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, *supra; see International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

Defendant here concedes that market analysis may establish a Robinson-Patman violation even in the absence of predation, and certainly the Seventh Circuit has so stated in *Lloyd A. Fry Roofing Co. v. FTC*, 371 F.2d 277, 282 (7th Cir.1966), a refrain repeated in some more recent cases such as *Double H. Plastics, Inc. v. Sonoco Products Company*, 732 F.2d 351 (3rd Cir.), *cert. denied*, 469 U.S. 900, 105 S.Ct. 275, 89 L.Ed.2d 212 (1984), and *Henry v. Chloride, Inc.*, *supra*, 809 F.2d at 1341. This court confesses to being highly uncertain what that means, if anything. A more efficient enterprise using, for example, some new technology, might be able to make a profit at prices below all its competition in one market and drive them from it, while charging a higher price in another market. It can be argued that that is competition, not predation, and that the antitrust laws do not condemn that price benefit to consumers, at least so long as insurmountable entry barriers do not create a continuing monopoly. If that enterprise raises prices later, its competitors can

return (as they also can if they become more efficient).

■ This court has already concluded that the evidence does not support a claim of predatory pricing here and that should end the matter. Plaintiff again contends that in some weeks it can show pricing below a relevant cost measurement, but no matter how the standard is verbalized such transitory fluctuations are not violations. They do not support a presumed intent, as they do not suggest an intent to drive competition from the marketplace and then raise prices to more than recapture past losses. They do not prove a possible substantial impact on competition, much less a dangerous probability of monopolization. Brief under-cost pricing hardly establishes the monopoly staying power with which Section 2 concepts, at least, are concerned.

■ But even if a market analysis is relevant in the absence of predation plaintiff does not indicate in a meaningful way why it would be relevant here. Plaintiff does not contend that the parties are in a capital-intensive, high technology industry. It argues that shelf space once lost is difficult to regain. Despite its continuing references to high entry barriers plaintiff does not, however, appear to suggest that defendant could, if dominant, charge monopoly prices and continue to exclude competitors for any extended period. At most, it contends that inertia in allocating shelf space will delay somewhat the entry of a competitor with products of equal quality and lower prices. It is difficult to see how that supports an argument that defendant's pricing could be predatory because it was rational only if losses could be recouped by subsequent extended monopoly pricing. "If the price-cutter cannot dominate—if other rivals can with reasonable ease take the place of any competitors knocked out—competition is not seriously or permanently damaged." *Henry v. Chloride, Inc.*, *supra*, 809 F.2d at 1345. Plaintiff contends that defendant has a dominant position in the Chicago market for snack foods other than potato chips, which it protects by potato chip price discrimination, and that in recent years plaintiff has

lost and defendant has gained market share. But that is a far cry from a drastically declining price structure or some other change in the market from which a threat to competition could be argued even if we assume that a threat without predation is a violation. Plaintiff's case rests, ultimately, upon an expansive view of *Utah Pie*, and that view is unwarranted.

That leaves, then, count III. Plaintiff there asserts claims under the state antitrust laws of Illinois, Indiana, Michigan and Wisconsin, and under the Illinois Uniform Deceptive Practices Act, the Illinois Consumer Fraud and Deceptive Business Practices Act and the Wisconsin Fraudulent Advertising Statute. Defendant initially contended that these state law claims fall if it prevailed on the federal claims because they are pendent. Plaintiff points out, however, that there is complete diversity, and defendant has apparently abandoned that contention. Conversely, plaintiff does not contend that state antitrust statutes give it a claim even though federal law does not, and it does not now urge that it is entitled to relief under the Wisconsin Fraudulent Advertising Statute. It argues, however, that there are triable issues under both Illinois statutes. Unfortunately, both parties have treated the state law claims in their memoranda as very much an afterthought. Indeed, plaintiff's one case citation was to a 1946 New York case. This court notes that in plaintiff's statement of contested issues in the final pretrial order it makes no reference to any state law claims. On the other hand, it has expressly abandoned only some of the state law claims advanced in paragraph 20 of the First Amended Complaint, those being subparagraphs (c), (d), (e), (g), (i), (j) and (*l*). Further, some of the subparagraphs are essentially price discrimination claims, and those are now foreclosed. Those are subparagraphs (a) and (b).

That leaves, then, claims that defendant engaged in advertising and promotional practices directly tied to the allocation of increased shelf space, had a program of acquisitions and mergers to forestall entry and lessen competition and il- legally induced store buyers and the like to allocate additional shelf space and product "and/or excluding other competitors' products." We assume that plaintiff does not contend that acquisitions and mergers have anything to do with the Illinois statutes. Although it is far from clear, plaintiff is apparently claiming that defendant on occasion bought additional shelf space, used false sales figures to get a larger allocation, and made various misrepresentations. Without, however, a more specific understanding of what claims remain, it is difficult for the parties to argue, and for this court to determine, their legal sufficiency under state law. The motion for summary judgment on count III is, therefore, denied, not because it is without merit but because this court cannot presently determine what merit it may have.